**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Thomas M. Wearsch
Email: twearsch@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,
Trustee for the SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>KINGATE GLOBAL FUND, LTD., KINGATE EURO FUND, LTD.<br><br>and<br><br>BANK OF BERMUDA, LIMITED,<br><br>Defendants. | Adv. Pro. No. _____ (BRL) |

**COMPLAINT**

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, et seq. ("SIPA"), by and through his undersigned counsel, for his Complaint, states as follows:

## NATURE OF PROCEEDING

1. This adversary proceeding arises from the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff"). In early December 2008, BLMIS generated client account statements for its nearly 7,000 client accounts at BLMIS. When added together, these statements purportedly show that clients of BLMIS had approximately $64.8 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts. Defendants Kingate Euro Fund, Ltd. ("Kingate Euro") and Kingate Global Fund, Ltd. ("Kingate Global") (collectively, "Kingate") received preferential payments from BLMIS, and the purpose of this proceeding is to recover the preferential payment received by Kingate.

2. This adversary proceeding is brought pursuant to 15 §§ U.S.C. 78fff(b) and 78fff-2(c)(3), sections 542, 547, 550(a) and 551 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and other applicable law, for turnover, accounting, preferences and damages, in connection with transfers of property by BLMIS to or for the benefit of Kingate. The Trustee seeks to set aside such transfers and preserve the property for the benefit of BLMIS's defrauded customers.

## JURISDICTION AND VENUE

3. This is an adversary proceeding brought pursuant to Bankruptcy Rule 7001(1) in this Court, the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United

States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4). This Court has personal jurisdiction under N.Y. C.P.R.L. § 302(a)(1) and Bankruptcy Rule 7004.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F) and (O).

5. Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

6. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, <u>inter</u> <u>alia</u>, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court that commenced the District Court Proceeding against Madoff and BLMIS (together, the "Madoff Defendants"). The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that the Madoff Defendants engaged in fraud through the investment advisor activities of BLMIS.

7. On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order, which appointed Lee S. Richards, Esq., as receiver (the "Receiver") for the assets of BLMIS. On December 18, 2008, the District Court entered the Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants (the "Preliminary Injunction Order"). Among other things, the Preliminary Injunction Order clarified that the Receiver is only appointed as to assets concerning the London entity, Madoff Securities International Ltd ("MSIL").

8.      On February 26, 2009, the Receiver submitted a report and application to Terminate the Receivership to the District Court. After receipt of submissions by the Trustee, the SEC, and the Department of Justice, and after a hearing on March 23, 2009, Judge Stanton issued an order discharging the Receiver and terminating the receivership. The District Court also ordered that the Trustee be substituted for the Receiver as Attorney under the December 15, 2009 Power of Attorney granted by Madoff, in his individual capacity, to act thereunder in connection with all of the issued shares of MSIL registered in Madoff's name.

9.      On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(3), SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

10.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

      (a)      appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

      (b)      appointed Baker & Hostetler, LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

      (c)      removed the case to this Bankruptcy Court pursuant to 15 U.S.C. § 78eee(b)(4).

11. By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

12. At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23:14-17.) Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (Id. at 23:20-21.).

13. As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

14. Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in addition to the powers granted by SIPA. Pursuant to 15 U.S.C. § 78fff(b), Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case.

15. Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

16. The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(1) because, among other reasons:

   a. BLMIS incurred losses as a result of the claims set forth herein;

   b. The Trustee is a bailee of customer funds entrusted to BLMIS for investment purposes; and

   c. The Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders"). As of this date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against Defendants. As assignee, the Trustee stands in the shoes of persons who have suffered injury, in fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.

# THE FRAUDULENT PONZI SCHEME

17.     BLMIS is a New York limited liability company that is wholly owned by Madoff. Founded in 1960, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, and chief executive officer, ran BLMIS with family members and employees. BLMIS had three business units: investment advisory (the "IA Business"), market making and proprietary trading.

18.     Madoff ascribed the IA Business's consistent investment success to his investment strategy called the "split-strike conversion" strategy which involved the purchase of securities, options and government securities.

19.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities, options and government securities that were owned in, or had been traded through, their accounts, and the growth of and profit from those accounts over time, these statements were a complete fabrication. The security purchases and trades depicted in the account statements never occurred and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. Indeed, there is no record of the Madoff Defendants having cleared a single purchase or sale of securities at the Deposit Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.

20.     The Madoff Defendants, over the years, falsely assured clients and regulators that BLMIS conducted all trades on the over-the-counter market in Europe, after hours. To bolster that false representation, BLMIS periodically wired hundreds of millions of dollars to BLMIS's

affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity controlled by Madoff. MSIL did not use the wired funds to purchase securities for the accounts of the IA Business clients.

21. Additionally, there is no evidence that the Madoff Defendants ever purchased or sold any of the options that they claimed to have purchased on customer statements. Options related to the S&P 100 companies are typically traded on the Chicago Board Options Exchange. There are no records of the Madoff Defendants having purchased any options on the Chicago Board Options Exchange.

22. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and the Madoff Defendants concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud. The money received from new investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to, or payments on behalf of, the other earlier investors. The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

23. During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits. Other investors, from time to time, redeemed or closed their accounts, transferred portions to other accounts or removed portions of them, and were paid consistently with the statements they had

been receiving. Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

24. When payments were made to or on behalf of these investors, including Kingate, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains. In reality, BLMIS had largely or wholly dissipated the investors' principal and had not made any profits whatsoever. In an attempt to conceal the ongoing fraud and thereby hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of such investors some or all of the inflated amount reflected in the falsified customer statements, including non-existent principal and fictitious profits, not such investors' true depleted account balances.

25. BLMIS used the funds deposited from new investors and new investments from existing customers to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers. Due to the siphoning and diversion of newly invested funds to pay requests for payments or redemptions from older account holders, BLMIS did not have the funds to repay the principal amounts due to the new investors on account of their newly invested funds. BLMIS was able to stay afloat only by using the principal invested by new clients to pay the old investors or their designees.

## **THE DEFENDANTS AND THE TRANSFER**

26. Defendant Kingate Global is an international business company, organized under the laws of the British Virgin Islands, with a principal place of business at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

27. Defendant Kingate Euro is an international business company, organized under the laws of the British Virgin Islands, with a principal place of business at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

28. Defendant Bank of Bermuda Limited ("Bank of Bermuda") is a banking institution with an address at 9 Bermudiana Road, Compass Point, 5th Floor, Pembroke, Bermuda (collectively Kingate Global, Kingate Euro and Bank of Bermuda are "Defendants").

29. Upon information and belief, at all times relevant hereto, Kingate Global was a client of the IA Business. According to BLMIS's records, Kingate Global maintained an account with BLMIS that was designated account 1FN061 (the "Kingate Global Account"). The Kingate Global Account was opened on or about March 2, 1994 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York. Pursuant to Section 10 of the Customer Agreement, the Customer Agreement was deemed made in the State of New York.

30. Upon information and belief, at all times relevant hereto, Kingate Euro was a client of the IA Business. According to BLMIS's records, Kingate Euro maintained an account with BLMIS that was designated account 1FN086 (the "Kingate Euro Account"). The Kingate Euro Account was opened on or about January 4, 1996 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York. Pursuant to Section 10 of the Customer Agreement, the Customer Agreement was deemed made in the State of New York.

31. Between March 1994 and the Filing Date, certain entities, including the Bank of Bermuda, for the benefit of Kingate Global, invested $963.45 million with BLMIS through 63 separate wire transfers directly into BLMIS's account at JPMorgan Chase & Co. in New York, New York, Account #000000140081703 (the "BLMIS Bank Account").

32. Between January 1996 and the Filing Date, Bank of Bermuda or its affiliates, for the benefit of Kingate Euro, invested $767.44 million with BLMIS through 92 separate wire transfers directly into BLMIS's account at JPMorgan Chase & Co. in New York, New York, Account #000000140081703 (the "BLMIS Bank Account").

33. By their terms, the Account Agreements were deemed to be entered into in the State of New York and were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Kingate Global Account and the Kingate Euro Account were held in New York, New York, through BLMIS. The Bank of Bermuda consistently wired funds to the BLMIS Bank Account in New York, New York for application to the Kingate Global Account the Kingate Euro Account and the conduct of trading activities. Kingate Global and Kingate Euro have intentionally taken advantage of the benefits of conducting transactions in the State of New York and, therefore, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

34. Additionally, at all times relevant hereto, Bank of Bermuda and its affiliates have consistently engaged in banking business and investment activities in New York, New York, including, but not limited to, the solicitation of investors and the conducting of trading and money management activities. As such, Bank of Bermuda and its affiliates have subjected themselves to the general jurisdiction of this Court.

35. On or about October 17, 2008, BLMIS wired $50,000,000 from the BLMIS Bank Account to the Bank of Bermuda, apparently for the benefit of Kingate Global. On or about November 28, 2008, BLMIS wired another $50,000,000 from the BLMIS Bank Account to the Bank of Bermuda, apparently for the benefit of Kingate Global (collectively, "the Kingate Global Transfers"). The Kingate Global Transfers totaled $100,000,000 and took place within 90 days of the Filing Date.

36. On or about October 3, 2008, BLMIS wired $40,000,000 from the BLMIS Bank Account to the Bank of Bermuda. On or about October 8, 2008, BLMIS wired $15,000,000 from the BLMIS Bank Account to the Bank of Bermuda. On or about October 22, 2008, BLMIS wired $50,000,000 from the BLMIS Bank Account to the Bank of Bermuda. On or about October 29, 2008, BLMIS wired $30,000,000 from the BLMIS Bank Account to the Bank of Bermuda. On or about November 28, 2008, BLMIS wired $20,000,000 from the BLMIS Bank Account to the Bank of Bermuda. All of these transfers were done apparently for the benefit of Kingate Euro (collectively, "the Kingate Euro Transfers"). The Kingate Euro Transfers totaled $155,000,000 and took place within 90 days of the Filing Date.

37. This Complaint seeks the return of the Kingate Global Transfers and the Kingate Euro Transfers made to or for the benefit of Kingate Global and Kingate Euro, respectively, by BLMIS or the value of such transfers.

38. Both the Kingate Global Transfers and the Kingate Euro Transfers are and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

39. Both the Kingate Global Transfers and the Kingate Euro Transfers are avoidable as preferences and recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

40. The Trustee's investigation is on-going, and the Trustee reserves the right to (i) supplement the information with respect to the Kingate Global Transfers and the Kingate Euro Transfers and any additional or subsequent transfers, and (ii) seek recovery of such additional or subsequent transfers.

## COUNT ONE
## PREFERENTIAL TRANSFER - 11 U.S.C. §§ 547(b), 550, AND 551

41. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

42. At the time of each of the Kingate Global Transfers and the Kingate Euro Transfers, Kingate Global and Kingate Euro were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

43. The Kingate Global Transfers and the Kingate Euro Transfers constitute transfers of interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

44. The Kingate Global Transfers and the Kingate Euro Transfers were to or for the benefit of Kingate Global and Kingate Euro, respectively.

45. The Kingate Global Transfers and the Kingate Euro Transfers were made on account of antecedent debts owed by BLMIS before such transfers were made.

46. Each of the Kingate Global Transfers and the Kingate Euro Transfers were made while BLMIS was insolvent.

47. Each of the Kingate Global Transfers and the Kingate Euro Transfers were made during the preference period under section 547(b)(4) of the Bankruptcy Code.

48. The Kingate Global Transfers and the Kingate Euro Transfers enabled Kingate to receive more than it would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) Kingate received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

49. The Kingate Global Transfers and the Kingate Euro Transfers constitute preferential transfers avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Kingate Global and Kingate Euro, as the case may be, pursuant to section 550(a) of the Bankruptcy Code.

50. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Kingate Global Transfers and the Kingate Euro Transfers, (b) directing that the Kingate Global Transfers and the Kingate Euro Transfers be set aside, and (c) recovering the Kingate Global Transfers and the Kingate Euro Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## TURNOVER AND ACCOUNTING – 11 U.S.C. § 542

51. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

52. The Kingate Global Transfers and the Kingate Euro Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

53. As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover of the Kingate Global Transfers and the Kingate Euro Transfers from the Defendants to the Trustee.

54. As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all transfers received by Defendants from BLMIS, directly or indirectly.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i. On the First Claim for Relief, pursuant to sections 547, 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Kingate Global Transfers and the Kingate Euro Transfers, (b) directing that the Kingate Global Transfers and the Kingate Euro Transfers be set aside, and (c) recovering the Kingate Global Transfers and the Kingate Euro Transfers, or the value thereof, from Kingate Global and Kingate Euro, as the case may be, for the benefit of the estate of BLMIS;

ii. On the Second Claim for Relief, pursuant to sections 542, 550(a), and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Kingate Global Transfers and the Kingate Euro Transfers be immediately delivered and turned over to the Trustee by the Defendants, and (b) for an accounting by the Defendants of the property that was the subject of

the Kingate Global Transfers and the Kingate Euro Transfers or the value of such property and all other transfers of property by BLMIS to Defendants, whether direct or indirect;

    iii.    On all Claims for Relief, pursuant to federal common law and sections 5001 and 5004 of the N.Y. C.P.L.R., awarding the Trustee prejudgment interest from the date on which the Kingate Global Transfers and the Kingate Euro Transfers were received;

    iv.    Reserving the Trustee's ability to supplement the information on the Kingate Global Transfers and the Kingate Euro Transfers and any additional transfers and seek recovery of such additional transfers.

    v.    Awarding the Trustee all applicable interest, costs, and disbursements of this action, including, but not limited to, the Trustee's attorneys' fees; and

    vi.    Granting Plaintiff such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: April 17, 2008
       New York, NY

    /s/ Thomas M. Wearsch
    Baker & Hostetler LLP
    45 Rockefeller Plaza
    New York, New York 10111
    Telephone: (212) 589-4200
    Facsimile: (212) 589-4201
    David J. Sheehan
    Email: dsheehan@bakerlaw.com
    Marc E. Hirschfield
    Email: mhirschfield@bakerlaw.com
    Thomas M. Wearsch
    Email:  twearsch@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*

Of Counsel:

Frederick W. Chockley, III
Baker & Hostetler LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, D.C. 20036
Telephone: (202) 861-1680
Facsimile: (202) 861-1783
Email: fchockley@bakerlaw.com