**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Thomas M. Wearsch
Email: twearsch@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>KINGATE GLOBAL FUND, LTD., KINGATE EURO FUND, LTD.<br><br>    and<br><br>BANK OF BERMUDA, LIMITED,<br><br>    Defendants. | Adv. Pro. No. 09-1161 (BRL) |

<u>**AMENDED COMPLAINT**</u>

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, et seq. ("SIPA"), by and through his undersigned counsel,

pursuant to Rule 15 of the Federal Rules of Civil Procedure for his Amended Complaint, states

as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Bernard L. Madoff ("Madoff").  In early December 2008, BLMIS generated client account

statements for its nearly 7,000 client accounts at BLMIS.  When added together, these statements

purportedly show that clients of BLMIS had approximately $64.8 billion invested with BLMIS.

In reality, BLMIS had assets on hand worth a small fraction of that amount.  On March 12, 2009,

Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts.  Defendants

Kingate Euro Fund, Ltd. ("Kingate Euro") and Kingate Global Fund, Ltd. ("Kingate Global")

(collectively, "Kingate") received preferential payments from BLMIS, and the purpose of this

proceeding is to recover the preferential payment received by Kingate.

2.      This adversary proceeding is brought pursuant to 15 §§ U.S.C. 78fff(b) and 78fff-

2(c)(3), sections 542, 547, 550(a) and 551 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code")

and other applicable law, for turnover, accounting, preferences and damages, in connection with

transfers of property by BLMIS to or for the benefit of Kingate.  The Trustee seeks to set aside

such transfers and preserve the property for the benefit of BLMIS's defrauded customers.

## JURISDICTION AND VENUE

3.      This is an adversary proceeding brought pursuant to Bankruptcy Rule 7001(1) in

this Court, the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the

"SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United

States District Court for the Southern District of New York as *Securities Exchange Commission*

*v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court

Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §

1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4). This Court has personal jurisdiction under

N.Y. C.P.R.L. § 302(a)(1) and Bankruptcy Rule 7004.

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F) and (O).

5.      Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

6.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for violation of the criminal securities laws, including, inter alia, securities fraud, investment

adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange

Commission ("SEC") filed a complaint in the District Court that commenced the District Court

Proceeding against Madoff and BLMIS (together, the "Madoff Defendants"). The District Court

Proceeding remains pending in the District Court. The SEC complaint alleged that the Madoff

Defendants engaged in fraud through the investment advisor activities of BLMIS.

7.      On December 12, 2008, The Honorable Louis L. Stanton of the District Court

entered an order, which appointed Lee S. Richards, Esq., as receiver (the "Receiver") for the

assets of BLMIS. On December 18, 2008, the District Court entered the Order on Consent

Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants

(the "Preliminary Injunction Order"). Among other things, the Preliminary Injunction Order

clarified that the Receiver is only appointed as to assets concerning the London entity, Madoff
Securities International Ltd ("MSIL").

8.      On February 26, 2009, the Receiver submitted a report and application to
Terminate the Receivership to the District Court.  After receipt of submissions by the Trustee,
the SEC, and the Department of Justice, and after a hearing on March 23, 2009, Judge Stanton
issued an order discharging the Receiver and terminating the receivership.  The District Court
also ordered that the Trustee be substituted for the Receiver as Attorney under the December 15,
2009 Power of Attorney granted by Madoff, in his individual capacity, to act thereunder in
connection with all of the issued shares of MSIL registered in Madoff's name.

9.      On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC
consented to a combination of its own action with an application of the Securities Investor
Protection Corporation ("SIPC").  Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(3), SIPC filed
an application in the District Court alleging, inter alia, that BLMIS was not able to meet its
obligations to securities customers as they came due and, accordingly, its customers needed the
protections afforded by SIPA.

10.     Also on December 15, 2008, Judge Stanton granted the SIPC application and
entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS
        pursuant to 15 U.S.C. § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15
        U.S.C. § 78eee(b)(3); and

(c)     removed the case to this Bankruptcy Court pursuant to 15 U.S.C. §
        78eee(b)(4).

11.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

12.     At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23:14-17.)  Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (Id. at 23:20-21.).

13.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway.  However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years.  Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme.  Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

14.    Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in addition to the powers granted by SIPA.  Pursuant to 15 U.S.C. § 78fff(b), Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case.

15.    Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

16.    The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(1) because, among other reasons:

   a.  BLMIS incurred losses as a result of the claims set forth herein;

   b.  The Trustee is a bailee of customer funds entrusted to BLMIS for investment purposes; and

   c.  The Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of this date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against Defendants.  As assignee, the Trustee stands in the shoes of persons who have suffered injury, in fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.

## THE FRAUDULENT PONZI SCHEME

17.     BLMIS is a New York limited liability company that is wholly owned by Madoff.
Founded in 1959, BLMIS operated from its principal place of business at 885 Third Avenue,
New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS
with family members and employees.  BLMIS had three business units: investment advisory (the
"IA Business"), market making and proprietary trading.

18.     Madoff ascribed the IA Business's consistent investment success to his
investment strategy called the "split-strike conversion" strategy which involved the purchase of
securities, options and government securities.

19.     Although clients of the IA Business received monthly or quarterly statements
purportedly showing the securities, options and government securities that were owned in, or had
been traded through, their accounts, and the growth of and profit from those accounts over time,
these statements were a complete fabrication.  The security purchases and trades depicted in the
account statements never occurred and the profits reported were entirely fictitious.  At the Plea
Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to
have purchased for customer accounts.  Indeed, there is no record of the Madoff Defendants
having cleared a single purchase or sale of securities at the Deposit Trust & Clearing
Corporation, the clearing house for such transactions, or any other trading platform on which
BLMIS could have reasonably traded securities.

20.     The Madoff Defendants, over the years, falsely assured clients and regulators that
BLMIS conducted all trades on the over-the-counter market in Europe, after hours.  To bolster
that false representation, BLMIS periodically wired hundreds of millions of dollars to BLMIS's

affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity controlled by

Madoff.  MSIL did not use the wired funds to purchase securities for the accounts of the IA

Business clients.

21.     Additionally, there is no evidence that the Madoff Defendants ever purchased or

sold any of the options that they claimed to have purchased on customer statements.  Options

related to the S&P 100 companies are typically traded on the Chicago Board Options Exchange.

There are no records of the Madoff Defendants having purchased any options on the Chicago

Board Options Exchange.

22.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme

and the Madoff Defendants concealed the ongoing fraud in an effort to hinder and delay other

current and prospective customers of BLMIS from discovering the fraud.  The money received

from new investors was not set aside to buy securities as purported, but instead was primarily

used to make the distributions to, or payments on behalf of, the other earlier investors.   The

money sent to BLMIS for investment, in short, was simply used to keep the operation going and

to enrich Madoff , his associates and others until such time as the requests for redemptions in

December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of

the Ponzi scheme.

23.     During the scheme, certain investors requested and received distributions of the

"profits" listed for their accounts which were nothing more than fictitious profits.  Other

investors, from time to time, redeemed or closed their accounts, transferred portions to other

accounts or removed portions of them, and were paid consistently with the statements they had

been receiving.  Some of those investors later re-invested part or all of those withdrawn

payments with BLMIS.

24.     When payments were made to or on behalf of these investors, including Kingate,

the falsified monthly statements of accounts reported that the accounts of such investors included

substantial gains.  In reality, BLMIS had largely or wholly dissipated the investors' principal and

had not made any profits whatsoever.  In an attempt to conceal the ongoing fraud and thereby

hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of

such investors some or all of the inflated amount reflected in the falsified customer statements,

including non-existent principal and fictitious profits, not such investors' true depleted account

balances.

25.     BLMIS used the funds deposited from new investors and new investments from

existing customers to continue operations and pay redemption proceeds to or on behalf of other

investors and to make other transfers.  Due to the siphoning and diversion of newly invested

funds to pay requests for payments or redemptions from older account holders,  BLMIS did not

have the funds to repay the principal amounts due to the new investors on account of their newly

invested funds.  BLMIS was able to stay afloat only by using the principal invested by new

clients to pay the old investors or their designees.

## THE DEFENDANTS AND THE TRANSFERS

26.     Defendant Kingate Global is an international business company, organized under

the laws of the British Virgin Islands, with a principal place of business at Bison Court, P.O. Box

3460, Road Town, Tortola, British Virgin Islands.

27.     Defendant Kingate Euro is an international business company, organized under the laws of the British Virgin Islands, with a principal place of business at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

28.     Defendant Bank of Bermuda Limited ("Bank of Bermuda") is a banking institution with an address at 9 Bermudiana Road, Compass Point, 5th Floor, Pembroke, Bermuda (collectively Kingate Global, Kingate Euro and Bank of Bermuda are "Defendants").

29.     Upon information and belief, at all times relevant hereto, Kingate Global was a client of the IA Business.  According to BLMIS's records, Kingate Global maintained an account with BLMIS that was designated account 1FN061 (the "Kingate Global Account").  The Kingate Global Account was opened on or about March 2, 1994 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

30.     Upon information and belief, at all times relevant hereto, Kingate Euro was a client of the IA Business.  According to BLMIS's records, Kingate Euro maintained an account with BLMIS that was designated account 1FN086 (the "Kingate Euro Account").  The Kingate Euro Account was opened on or about January 4, 1996 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

31.     The Customer Agreements signed by BLMIS and both Kingate funds states that all transactions are subject to the Securities Exchange Act of 1934, the Commodities Exchange

Act, the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission, all laws of the United States. Kingate voluntarily made transactions with BLMIS subject to these laws.

32.     On July 1, 1996, the Bank of Bermuda entered into a Sub-Custody Agreement with BLMIS whereby BLMIS would act as the sub-custodian for certain funds for which the Bank of Bermuda was the custodian. In May 2002, after some negotiation, the two parties executed a Letter of Amendment to the Sub-Custody Agreement. BLMIS held these funds in New York, New York for the benefit of the Bank of Bermuda.

33.     Between March 1994 and the Filing Date, certain entities, including the Bank of Bermuda, for the benefit of Kingate Global, invested $963.45 million with BLMIS through 63 separate wire transfers directly into BLMIS's account at JPMorgan Chase & Co. in New York, New York, Account #000000140081703 (the "BLMIS Bank Account").

34.     Between January 1996 and the Filing Date, Bank of Bermuda or its affiliates, for the benefit of Kingate Euro, invested $767.44 million with BLMIS through 92 separate wire transfers directly into BLMIS's account at JPMorgan Chase & Co. in New York, New York, Account #000000140081703 (the "BLMIS Bank Account").

35.     By their terms, the Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Kingate Global Account and the Kingate Euro Account were held in New York, New York, through BLMIS. The Bank of Bermuda consistently wired funds to the BLMIS Bank Account in New York, New York for application to the Kingate Global Account the Kingate Euro Account and the conduct of trading activities. Kingate Global and Kingate Euro have intentionally taken

advantage of the benefits of conducting transactions in the State of New York and, therefore, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

36.     In addition to the Sub-Custody Agreement, at all times relevant hereto, Bank of Bermuda and its affiliates have consistently engaged in banking business and investment activities in New York, New York, including, but not limited to, the solicitation of investors and the conducting of trading and money management activities.  As such, Bank of Bermuda and its affiliates have subjected themselves to the general jurisdiction of this Court.

37.     On or about July 18, 2008, BLMIS wired $50,000,000 from the BLMIS Bank Account to the Bank of Bermuda, apparently for the benefit of Kingate Global.  This transfer took place within two years of the Filing Date but outside the 90-day limit for preferential payments under 11 U.S.C. § 547(b) ("the Kingate Global Two Year Transfer").

38.     On or about October 17, 2008, BLMIS wired $50,000,000 from the BLMIS Bank Account to the Bank of Bermuda, apparently for the benefit of Kingate Global.  On or about November 28, 2008, BLMIS wired another $50,000,000 from the BLMIS Bank Account to the Bank of Bermuda, apparently for the benefit of Kingate Global.  These latter transfers totaled $100,000,000 and took place within 90 days of the Filing Date (collectively, "the Kingate Global 90-Day Transfers").

39.     On or about August 13, 2008, BLMIS wired $20,000,000 from the BLMIS Bank Account to the Bank of Bermuda.  On or about August 14, 2008, BLMIS wired $10,000,000 from the BLMIS Bank Account to the Bank of Bermuda.  On or about August 18, 2008, BLMIS wired $30,000,000 from the BLMIS Bank Account to the Bank of Bermuda.  On or about September 9, 2008, BLMIS wired  $20,000,000 from the BLMIS Bank Account to the Bank of

Bermuda.  On or about September 10, 2008, BLMIS wired $10,000,000 from the BLMIS Bank

Account to the Bank of Bermuda.  All of these transfers were done apparently for the benefit of

Kingate Euro.  These transfers totaled $90,000,000 and took place within two years of the Filing

Date but outside the 90-day limit for preferential payments under 11 U.S.C. § 547(b)

(collectively, "the Kingate Euro Two Year Transfers").

40.     On or about October 3, 2008, BLMIS wired $40,000,000 from the BLMIS Bank

Account to the Bank of Bermuda.  On or about October 8, 2008, BLMIS wired $15,000,000

from the BLMIS Bank Account to the Bank of Bermuda.  On or about October 22, 2008, BLMIS

wired $50,000,000 from the BLMIS Bank Account to the Bank of Bermuda.   On or about

October 29, 2008, BLMIS wired $30,000,000 from the BLMIS Bank Account to the Bank of

Bermuda.  On or about November 28, 2008, BLMIS wired $20,000,000 from the BLMIS Bank

Account to the Bank of Bermuda.  These latter transfers were done apparently for the benefit of

Kingate Euro (collectively, "the Kingate Euro 90-Day Transfers").  The Kingate Euro 90-Day

Transfers totaled $155,000,000 and took place within 90 days of the Filing Date.

41.     Upon information and belief, Defendants knew or should have known that

Madoff's IA Business was predicated on fraud.  Hedge funds and funds of funds like the

Defendants were sophisticated investors that accepted fees from their customers based on

purported assets under management and/or stock performance in consideration for the diligence

they were expected to exercise in selecting and monitoring investment managers like Madoff.

The Defendants failed to exercise reasonable due diligence of BLMIS and its auditors in

connection with the Ponzi scheme.  Among other things, the Defendants were on notice of the

following indicia of irregularity and fraud but failed to make sufficient inquiry:

a.     Financial industry press reports, including a May 27, 2001 article in Barron's

entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep

mum," and a May, 2001 article in MAR/Hedge, a semi-monthly newsletter that is widely read by

hedge fund industry professionals, entitled "Madoff Tops Charts; Skeptics Ask How," raised

serious questions about the legitimacy of BLMIS and Madoff and their ability to achieve the IA

Business returns they purportedly had achieved using the split-strike conversion strategy Madoff

claimed to employ.

b.     Madoff avoided questions about his IA Business operations, was consistently

vague in responding to any such questions, and operated with no transparency.

c.     BLMIS did not provide its customers with electronic real-time online access to

their accounts, which was and is customary in the industry for hedge fund and fund of funds

investors.  BLMIS also utilized outmoded technology, including paper trading confirmations,

despite Madoff's history of being in the forefront of computer-based trading.  The use of paper

confirmations created after the fact was critical to Madoff's ability to perpetuate his Ponzi

scheme.

d.     BLMIS functioned as both investment manager and custodian of securities.  This

arrangement eliminated another frequently utilized check and balance in investment management

by excluding an independent custodian of securities from the process, and thereby furthering the

lack of transparency of BLMIS to investors, regulators, and other outside parties.

e.     BLMIS produced returns that were too good to be true, reflecting a pattern of

abnormal profitability, both in terms of consistency and amount, that was simply not credible.

BLMIS's returns could not be reproduced by other skilled hedge fund managers, and those

managers who attempted to employ the split-strike conversion strategy purportedly used by

BLMIS consistently failed even to approximate its results.

    f.    The Defendants received far higher purported annual rates of return on their

investments with BLMIS as compared to the interest rates BLMIS could have paid to

commercial lenders during the relevant time period.  Upon information and belief, the

Defendants never questioned why Madoff accepted their investment capital in lieu of other

available alternatives that would have been more lucrative for BLMIS.

    g.    At times, the Defendants' monthly account statements reflected trades purchased

or sold on behalf of the Defendants' accounts in certain securities that were allegedly executed at

prices outside the daily range of prices for such securities traded in the market on the days in

question.  For example, the monthly account statements received by the Defendants for the

month of October 2003 reported a purchase of 984,137 and 240,240 shares, for Kingate Global

and Kingate Euro respectively, of Intel Corporation (INTC) on the Settlement Date of October 7,

2003, which was purportedly executed on the Trade Date of October 2, 2003 at a price of

$27.63.  However, the daily price range for Intel Corporation stock on October 2, 2003 ranged

from a low of $28.41 to a high of $28.95.  In a second example, this time a purported sale, the

monthly account statements received by the Defendants for the month of December 2006

reported a sale of 233,281 and 60,449 shares, for Kingate Global and Kingate Euro respectively,

of Merck & Co., Inc. (MRK) at a purported executed at a price of $44.61 on the Trade Date of

December 22, 2006 with a Settlement Date of December 28, 2006.  However, the daily price

range for Merck stock on the purported trade date of December 22, 2006 ranged from a low of

$42.78 to a high of $43.42.  In total for the analyzed time period through November 2008,

Defendants Kingate Global and Kingate Euro received monthly account statements that

displayed 185 trades that were purportedly executed at a price outside the daily price range. This

pattern in each of Kingate Global and Kingate Euro's accounts should have caused a

sophisticated hedge fund manager like Kingate Global and Kingate Euro to independently verify

the trades with the public exchanges and demand more transparency into the operations of

BLMIS.

h.    The BLMIS stated "split/strike strategy" required purchases of options on the

S&P 100 index, ("OEX"), in combination with purchases of select underlying stocks that are

components of the S&P 100 index. These options are traded on the Chicago Board Options

Exchange, ("CBOE"), through a licensing agreement between CBOE and Standard & Poor's

("S&P"). As reported on the monthly account statements for January 2008 received by

Defendants, on January 23, 2008, BLMIS purportedly bought a total of 17,859 and 5,762 OEX

put options (with February expiration and a strike price of 600) for Kingate Global's and Kingate

Euro's accounts, respectively, when the total volume traded on the CBOE for such contracts was

8,645. Similarly, BLMIS purportedly bought a total of 17,859 and 5,762 OEX call options (with

February expiration and a strike price of 610) for these same accounts when the total volume

traded on the CBOE for such contracts was 631. In each instance, Defendants should have

understood that the option volume being reported was impossible, as there were not that many

option contracts available on the CBOE.

i.    BLMIS had purportedly told its investors that it purchased these options in the

over-the-counter ("OTC") market. Trading options in the OTC market would likely have been

more expensive than trading over the CBOE, yet those costs did not appear to be passed on to

BLMIS' investors. The absence of such costs, together with BLMIS' representation that it was

trading in the OTC market, should have prompted sophisticated hedge funds like Kingate Euro

and Kingate Global to request verification of the trades and demand more transparency into the operations of BLMIS.

j.      BLMIS' statements to investors reflected a consistent ability to trade stocks near their monthly highs and lows to generate consistent and unusual profits.  No experienced investment professional could have reasonably believed that this could have been accomplished legitimately.

k.      BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom was semi-retired, with offices located in a strip mall.  No experienced investment professional could have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS.

l.      The compensation system utilized by BLMIS was atypical in that BLMIS, the entity purportedly employing the hugely-successful and secret proprietary trading system, was compensated only for the trades that it executed, while Defendants, whose only role was to funnel money to BLMIS, received administrative fees and a share of the profits that would normally go to the entity in the position of BLMIS.  This compensation arrangement, together with the lack of transparency and other factors listed herein, should have caused an experienced investment professional to question Madoff's operation.

m.      Despite its immense size, BLMIS was substantially a family-run operation, employing many of Madoff's relatives, and virtually no outside professionals.  Indeed, the comptroller for BLMIS was based in Bermuda and was not an in-house comptroller with full access to information about BLMIS operations.

n.      At no time did the Defendants conduct a performance audit of BLMIS or match any trade confirmations provided by BLMIS with actual trades executed through any domestic or foreign public exchange despite the fact the Defendant Funds had hundreds of millions of dollars in assets and easily could have afforded to do this.

o.      Based on all of the foregoing factors, many banks, industry advisors and insiders who made an effort to conduct reasonable due diligence flatly refused to deal with BLMIS and Madoff because they had serious concerns that their IA Business operations were not legitimate.

p.      BLMIS purported to convert all of its holdings to cash immediately before each quarterly report, a strategy that had no practical benefit but which had the effect of shielding BLMIS' purported trading activities from scrutiny.

42.     This Complaint seeks the return of the all of the above-listed transfers made to or for the benefit of Kingate Global and Kingate Euro, respectively, by BLMIS or the value of such transfers.

43.     All of the transfers are and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

44.     Both the Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

45.     Both the Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers are avoidable as preferences and recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

46.     The Trustee's investigation is on-going, and the Trustee reserves the right to (i) supplement the information with respect to the Kingate Global Two Year and 90-Day Transfers and the Kingate Euro Two Year and 90-Day Transfers and any additional or subsequent transfers, and (ii) seek recovery of such additional or subsequent transfers.

## COUNT ONE
## PREFERENTIAL TRANSFER - 11 U.S.C. §§ 547(b), 550, AND 551

47.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

48.     At the time of each of the Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers, Kingate Global and Kingate Euro were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

49.     The Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers constitute transfers of interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

50.     The Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers were to or for the benefit of Kingate Global and Kingate Euro, respectively.

51.     The Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers were made on account of antecedent debts owed by BLMIS before such transfers were made.

52.     Each of the Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers were made while BLMIS was insolvent.

53.     Each of the Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers were made during the preference period under section 547(b)(4) of the Bankruptcy Code.

54.     The Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers enabled Kingate to receive more than it would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) Kingate received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

55.     The Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers constitute  preferential transfers avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Kingate Global and Kingate Euro, as the case may be, pursuant to section 550(a) of the Bankruptcy Code.

56.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers, (b) directing that the  Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers be set aside, and (c) recovering the Kingate Global 90-Day Transfers and the Kingate Euro 90-Day Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## TURNOVER AND ACCOUNTING – 11 U.S.C. § 542

57.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

58.     The Kingate Global Two Year and 90-Day Transfers and the Kingate Euro Two Year and 90-Day Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

59.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover of the Kingate Global Two Year and 90-Day Transfers and the Kingate Euro Two Year and 90-Day Transfers from the Defendants to the Trustee.

60.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all transfers received by Defendants from BLMIS, directly or indirectly.

## COUNT THREE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550, AND 551

61.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

62.     The Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers were made on or within two years before the filing date of BLMIS' case.

63.    The Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers
were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS'
then existing or future creditors.

64.    The Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers
constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the
Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a).

65.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of
the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the
Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers, (b) directing that
the Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers be set aside,
and (c) recovering the Kingate Global Two Year Transfer and the Kingate Euro Two Year
Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor
of the Trustee and against the Defendants as follows:

i.    On the First Claim for Relief, pursuant to sections 547, 550(a), and 551 of the
Bankruptcy Code: (a) avoiding and preserving the Kingate Global 90-Day Transfers and the
Kingate Euro 90-DayTransfers, (b) directing that the Kingate Global 90-Day Transfers and the
Kingate Euro 90-Day Transfers be set aside, and (c) recovering the Kingate Global 90-Day
Transfers and the Kingate Euro 90-Day Transfers, or the value thereof, from Kingate Global and
Kingate Euro, as the case may be, for the benefit of the estate of BLMIS;

ii.    On the Second Claim for Relief, pursuant to sections 542, 550(a), and 551 of the
Bankruptcy Code: (a) that the property that was the subject of the Kingate Global Two Year and

90-Day Transfers and the Kingate Euro 90-Day and Two-Year Transfers be immediately delivered and turned over to the Trustee by the Defendants, and (b) for an accounting by the Defendants of the property that was the subject of the Kingate Global Two Year and 90-Day Transfers and the Kingate Euro Two Year and 90-Day Transfers or the value of such property and all other transfers of property by BLMIS to Defendants, whether direct or indirect;

iii.     On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers, (b) directing that the Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers be set aside, and (c) recovering the Kingate Global Two Year Transfer and the Kingate Euro Two Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

iv.     On all Claims for Relief, pursuant to federal common law and sections 5001 and 5004 of the N.Y. C.P.L.R., awarding the Trustee prejudgment interest from the date on which the Kingate Global Two Year and 90-Day Transfers and the Kingate Euro Two Year and 90-Day Transfers were received;

v.     On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLIMS' estate;

vi.     On all Claims for Relief, assignment of Defendants' rights to seek refunds from the government for federal, state, and local taxes paid on Fictitious Profits during the course of the scheme;

vii.     Reserving the Trustee's ability to supplement the information on the Kingate Global Two Year and 90-Day Transfers and the Kingate Euro Two Year and 90-Day Transfers and any additional transfers and seek recovery of such additional transfers.

viii.    Awarding the Trustee all applicable interest, costs, and disbursements of this

action, including, but not limited to, the Trustee's attorneys' fees; and

ix.    Granting Plaintiff such other, further, and different relief as the Court deems just,

proper, and equitable.

Dated: May 8, 2009
       New York, NY

/s/ Thomas M. Wearsch
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Thomas M. Wearsch
Email:  twearsch@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*

Of Counsel:

Frederick W. Chockley, III
Baker & Hostetler LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, D.C. 20036
Telephone: (202) 861-1680
Facsimile: (202) 861-1783
Email: fchockley@bakerlaw.com