UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
In re:                                              :
                                                    :
BERNARD L. MADOFF INVESTMENT                        :      Case No. 08-99000 (SMB)
SECURITIES LLC,                                     :      Adv. Proc. No. 08-01789 (SMB)
                                                    :      SIPA LIQUIDATION
                              Debtor.               :
---------------------------------------------------------------X
IRVING H. PICARD, Trustee for the Liquidation       :
of Bernard L. Madoff Investment Securities LLC,     :
                                                    :
                                                    :
                              Plaintiff,            :
                                                    :      Adv. Proc. No. 09-01161 (SMB)
FEDERICO CERETTI, et al.,                           :
                                                    :
                              Defendants.           :
---------------------------------------------------------------X

**MEMORANDUM DECISION GRANTING IN PART AND
DENYING IN PART DEFENDANT KINGATE GLOBAL
FUND, LTD.'S AND KINGATE EURO FUND LTD.'S
MOTIONS TO DISMISS THE FOURTH AMENDED COMPLAINT**

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Plaintiff, Irving H. Picard,*
  *Trustee for the Liquidation of*
  *Bernard L. Madoff Investment Securities LLC*
45 Rockefeller Plaza
New York, NY 10111

        Anthony M. Gruppuso, Esq.
        Marc E. Hirschfield, Esq.
        Geraldine E. Ponto, Esq.
        David J. Sheehan, Esq.
        Michelle R. Usitalo, Esq.
        Thomas M. Wearsch, Esq.
        Gonzalo S. Zeballos, Esq.
                Of Counsel

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for Joint Liquidators of Kingate Global Fund*
  *Ltd. and Kingate Euro Fund Ltd.*
51 Madison Avenue, 22nd Floor
New York, NY 10010

     Susheel Kirpalani, Esq.
     Rex Lee, Esq.
     Robert S. Loigman, Esq.
     Xochitl S. Strohbehn, Esq.
       Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro," and with Kingate Global, the "Funds" or the "Kingate Funds") were Madoff feeder funds that received transfers aggregating $825 million from Bernard L. Madoff Investment Securities LLC ("BLMIS") within six years of the filing date of the BLMIS liquidation proceeding. The BLMIS trustee, Irving H. Picard (the "Trustee"), has sued the Kingate Funds as initial transferees and the other defendants as subsequent transferees to avoid and recover the transfers.

The Joint Liquidators of the Kingate Funds (the "Movants") have moved to dismiss Counts I through VIII (the "Avoidance Claims"), Counts X and XII (the "Disallowance Claims") and Count XI (the "Equitable Subordination Claim") asserted in the Fourth Amended Complaint, dated, Mar.17, 2014 ("FAC") (ECF Doc. # 100). For the reasons that follow, Counts X and XII are dismissed, and the motion is otherwise denied.

2

## BACKGROUND

A.    **Madoff and BLMIS[1]**

The background information is taken from the well-pleaded factual allegations of the FAC and other information that the Court may consider on a motion to dismiss for failure to state a claim.  Bernard L. Madoff, through BLMIS, operated a Ponzi scheme inducing investors to open discretionary trading accounts with BLMIS for the ostensible purpose of buying and selling securities.  Madoff professed to engage in an investment strategy known as the "split-strike conversion strategy," or SSC Strategy, through which he purported to invest in a basket of stocks within the Standard & Poor's 100 Index ("S&P 100 Index") that was intended to mimic the S&P 100 Index.  (¶ 25.) [2]  Supposedly, he would strategically time the purchases and sales, and at times, the funds would be out of the market and completely invested in U.S. Treasury securities. (¶ 25.)  As a hedge, BLMIS would supposedly sell call options and buy put options on the S&P 100 Index.  This is commonly referred to as a "collar."  (¶ 26.)

None of this actually happened.  No securities were purchased or sold, and instead, BLMIS used the money invested by BLMIS customers to make distributions to other BLMIS customers.  (¶ 28.)

Madoff was arrested on December 11, 2008 (the "Filing Date").  (¶ 13.)  Upon application by the Securities Investor Protection Corporation ("SIPC") made pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq.*, the District Court appointed Irving H. Picard, Esq. as Trustee for BLMIS, and removed the case to this

---

[1]       Headings are derived from the FAC.  They are descriptive only, and do not necessarily imply the Court's views of the allegations.

[2]       The parenthetical notation "(¶ __)" refers to the paragraphs in the FAC.

Court.  (¶¶ 15-16.)  Madoff pleaded guilty on March 12, 2009 to an eleven count criminal

information, admitting he "operated a Ponzi scheme through the investment advisory side of

[BLMIS]."

**B.      The Defendants**

There are many defendants but the following discussion is limited to those who are

germane to the Movants' motion.

**1.      Ceretti and Grosso**

Frederico Ceretti and Carlo Grosso are Italian nationals residing in the United Kingdom.

(¶¶ 32-33.)

**2.      The Kingate Funds**

Ceretti and Grosso formed the Kingate Funds.  (¶ 2.)  Both are British Virgin Islands

("BVI") companies with addresses registered in BVI.  (¶¶ 38, 40.)  Kingate Global opened an

account with BLMIS in March 1994; Kingate Euro opened an account with BLMIS as a sub-

fund of Kingate Global on January 1, 1996.  (¶¶ 39, 41.)  The Kingate Funds are in liquidation

proceedings in BVI.  (¶ 43.)

BLMIS transferred the following approximate amounts to the Kingate Funds:

| Fund | Transfers within six years of the Filing Date ($) | Transfers within two years of the Filing Date ($) | Transfers within ninety days of the Filing Date ($) |
|---|---|---|---|
| Kingate Global | 360,000,000 | 150,000,000 | 100,000,000 |
| Kingate Euro | 465,000,000 | 245,000,000 | 155,000,000 |

Despite these transfers, the Kingate Funds' deposits exceeded their withdrawals.  Kingate

Global's net equity as computed by the Trustee is $578,862,952, (FAC, Ex. B, p. 25 of 25), and

Kingate Euro's net equity is $220,885,142.  (*Id.*, Ex. B, p. 23 of 23.)  In total, they lost nearly $800 million investing in BLMIS.

### 3.    The Management Defendants

Grosso formed FIM Limited, a London asset management company, in 1981.  (¶¶ 35, 49.)  Ceretti and Grosso formed FIM Advisers, a London limited liability partnership, in 2004, where Ceretti serves as chief executive officer and Grosso serves as executive chairman and chief investment officer.  (¶¶ 36, 50.)  FIM Limited and FIM Advisors are referred to collectively as "FIM."

Ceretti and Grosso formed Kingate Management Limited ("Kingate Management") under the laws of Bermuda in 1994 to manage the Kingate Funds, and Kingate Management then appointed FIM, among other things, to advise and consult with Kingate Management concerning the Kingate Funds. (¶¶ 4-5, 44, 46, 51-53, 110, 112.)  FIM acted as agent for Kingate Management, and Kingate Management acted as agent for the Kingate Funds.  (¶ 83.)  Between April 23, 2001 and 2005 (when it was replaced by FIM Advisors), FIM Limited served as a non-exclusive distributor for the Kingate Funds, identifying and soliciting potential shareholders. (¶ 112.)  FIM and Kingate Management are referred to collectively as the "Management Defendants."

Kingate Management is in liquidation in Bermuda.  (¶ 48.)

### 4.    The Administrator

Citi Hedge, formerly known as BISYS Hedge Fund Services Limited ("BISYS") and Hemisphere Management Limited ("Hemisphere"), is a Bermuda corporation.  (¶ 72.) Christopher Wetherhill ("Wetherhill") founded Hemisphere and was its chief executive officer

and president from 1981 to 2000. He was also a director of the Kingate Funds from their formation until 2008, and was an officer of Hemisphere at the same time he was a director of the Kingate Funds. (¶ 74.) Citi Hedge, through its earlier iterations, became the administrator of Kingate Global in 1994 and of Kingate Euro in 2000. (¶¶ 73, 76.) It also acted as registrar to each of the Kingate Funds beginning May 1, 2000. (¶ 78.)

Ceretti, Grosso, the Management Defendants and Citi Hedge are sometimes referred to collectively as the "Non-Fund Defendants."

### B.    Ceretti's and Grosso's Close Connections to Madoff

Ceretti and Grosso were introduced to Madoff in the early 1990s by Sandra Manzke, a hedge fund manager then affiliated with Tremont (Bermuda) Limited ("Tremont"). (¶ 94.) In 1993, Madoff informed fund managers that BLMIS would only accept institutional investors for its investment advisory business. (¶ 95.) The Kingate Funds were created by Ceretti and Grosso to solicit investors for BLMIS primarily from continental Europe, (¶ 96), and Ceretti and Grosso prepared or otherwise participated in the presentation of the Kingate Funds' public materials sent to shareholders to encourage investments in the Kingate Funds. (¶ 96.) The Kingate Funds also offered other fund managers without access to BLMIS an opportunity to invest with BLMIS. (¶ 97.)

Ceretti and Grosso were part of Madoff's inner circle. Ceretti, Grosso and Madoff and their wives dined together in London. (¶ 102.) Madoff told one potential investor that he did not meet with investors and should meet with Grosso to learn about BLMIS. (¶ 98.) Grosso met with Madoff at least twice a year, and during those meetings and various telephone conversations they discussed the performance of BLMIS and the Kingate Funds. (¶ 99.) At Madoff's

6

invitation in 2001, they met on the 17th floor which was off limits to all but a few BLMIS

employees, select third parties, and Madoff family members.  (¶ 100.)  The 17th floor offices

included antiquated computers that were not connected to the BLMIS network and were used by

BLMIS employees to execute billions of dollars of trades on a monthly or even daily basis.

(¶ 100.)  Besides in-person meetings, Ceretti and Grosso and other FIM employees participated

in 286 telephone conversations with BLMIS between 2004 and 2008, including a long talk on

December 2, 2008, days before Madoff's arrest.  (¶¶ 99, 101.)  Grosso also had 225 telephone

calls with Cohmad Securities Corp., an entity co-owned by Madoff that referred investors to

BLMIS.  (¶ 103.)

## C.    The Kingate Funds' Multi-Layer Management Structure

The Kingate Funds did not charge their shareholders performance fees; instead the

shareholders paid a management fee of 1.5% of the funds' net asset value split between Kingate

Management[3] and Tremont.[4]  (¶ 107.)  Between 1996 and November 2008, Kingate Funds paid

$376,052,130 in management fees.  (¶¶ 108-09.)

Kingate Management represented to shareholders and potential shareholders that it would

review "the activity of the investment adviser to ensure that it complies with the Funds'

investment guidelines and also [is] undertaking all actions that might be necessary in the

furtherance of the investment objectives of the funds," (¶ 115), and the Information

Memorandum provided to potential shareholders for each of the Kingate Funds stated that

---

[3]    Beginning in December 1995, FIM Limited received a portion of the management fee paid to Kingate
Management as a consultant.  (¶ 110.)  FIM Advisers replaced FIM Limited in 2005.  (*Id.*)

[4]    On or about March 1, 1995, Kingate Management and Tremont executed a co-manager agreement with
Kingate Global under which Kingate Management and Tremont were obligated to evaluate and monitor BLMIS,
arrange accounting and administrative services, and provide all other necessary management services to Kingate
Global.  (¶ 106.)

Kingate Management "evaluates and monitors the Investment Advisor [BLMIS] and, in general,

provides all necessary management services to the Fund." (¶ 116.) The 2006 Kingate Global

Information Memorandum stated that FIM Advisers "render[ed] consulting advice to [Kingate

Management] with respect to certain aspects of the Fund's operational, administrative,

marketing, accounting and legal matters." (¶ 117.) Finally, the management agreements

between Kingate Management and Kingate Funds allowed the former to delegate all of its duties

to FIM except the continuing obligation to verify FIM's competence. (¶ 118.)

**D.    The Defendants Knowingly Facilitated Madoff's Fraudulent IA Business**

**1.    Efforts to Shield Madoff From Outside Scrutiny**

Kingate Funds did not mention "Madoff" or "BLMIS" in the annual Informational

Memoranda sent to potential shareholders. (¶ 119.) When asked by an investor if he could

arrange an introduction with Madoff, Ceretti told the investor that it was a "sticky issue."

(¶ 120.) In an email dated November 21, 2008, to an FIM Advisers employee, with a copy sent

to Ceretti, Grosso responded to concerns raised by an analyst regarding Madoff's lack of

transparency by explaining one of the Kingate Funds' roles: "[i]t is true that investors do not

have direct access to Madoff, who tolerates structures like Kingate to act as buffers between

Madoff and investors." Kingate Management's Shazieh Salahuddin contacted Frank DiPascali at

BLMIS in July 2006 regarding discrepancies in Kingate Funds' net asset valuations, and

Salahuddin expressed her dissatisfaction with DiPascali's explanation to Ceretti and Grosso.

(¶ 121.) Ceretti responded that she should raise her concerns within Kingate Management. (*Id*.)

Wetherill did not resolve the discrepancy but reassured Ceretti and Grosso by indicating

Wetherill had spoken with DiPascali. ( *Id*.)

### 2.    FIM's High Standards of Due Diligence

FIM's website promoted its extensive experience in asset management:

> FIM's investment model is based upon a disciplined and structured approach to research, portfolio management, and risk management.  The model gives FIM a clear edge in the sourcing of new managers, in conducting in-depth due-diligence, and in structuring portfolios.

(¶ 122.)  FIM regularly reviewed markets, strategies, managers, and peer groups, and required its research specialists to conduct in-depth analysis into every aspect of every potential investment.

(¶ 123.)  Each portfolio was subjected to continuous analysis to ensure that all risk factors were identified and controlled and that all internal and external management portfolio policies were followed.  Risk management was integral to ensure "that the manager remains within his own investment limits, and that the fund is being managed according to its stated objective, without developing unexpected risk exposures or strategy drift."  (*Id.*)

FIM used the "four limbs of due diligence: qualitative, legal, quantitative, and operational;" each limb consisted of a dedicated team.  (¶ 124.)  Its due diligence included monitoring "the effectiveness of the systems and procedures used to value the investment portfolio, the independence of the pricing of the portfolio, the effectiveness of the reconciliations performed" and the prime broker arrangement with the fund.  It also monitored on a weekly basis the risk of the portfolio and the individual funds within the portfolio.  (*Id.*)

Each due diligence team created a report, and the four reports were combined into a single report, usually spanning between forty-five and fifty pages, that would ultimately be presented to the investment committee.  (¶ 125.)  FIM "scored" each of the "limbs" of due diligence to assist its analysts in evaluating each fund, and would not invest in a fund until it completed its due diligence procedures.  (*Id.*)  An analyst who had a concern with an investment

discussed the issue and closely monitored the fund manager, typically through weekly or bi-weekly contact.  (¶ 126.)  If the concern persisted for three months, the investment committee's policy was to redeem the investment.  ( *Id*.)

FIM's investment committee considered one fund manager's persistent refusal to meet with investors a sign of a high probability of fraud.  (¶ 120.)  On at least one occasion in August 2007, FIM recommended liquidating an investment that analysts described as "too good to be true" with a "limited downside" that made them feel "uneasy."  (¶ 127.)  FIM records show that an investment adviser with lack of transparency, lack of independent oversight, and operational issues, and an investment result with low correlation with peer funds, all characteristics of BLMIS, were causes for concern.  ( *Id*.)

### 3.    The Defendants Knew that FIM's High Due Diligence Standards Were Not Applied to BLMIS and the Kingate Funds

FIM did not apply its high due diligence standards to BLMIS and acknowledged as much.  It did not create a "four limb" due diligence report for the Kingate Funds, and the FIM investment committee did not engage in substantive discussions of the Kingate Funds or BLMIS at its regular meetings.  (¶¶ 128-29.)  A March 2008 report on thirty-one holdings included detailed information on only thirty; Kingate Global's page was blank.  (¶ 130.)  That same month, an investor contacted Kingate Management requesting due diligence materials. Salahuddin forwarded the email to Ceretti, Grosso and Wetherhill, noting that Kingate Management did not have "half the things" requested.  (¶ 131.)  Grosso acknowledged in an email to an investor that "the Kingate Fund . . . has a somewhat unusual structure, and that as a consequence, there are a number of operational D[ue] D[iligence] points that may not be answered to your total satisfaction."  (¶ 132.)  In a November 2008 email to FIM's Head of

Operational Due Diligence, Eric Lazear ("Lazear"), Grosso acknowledged "[w]e have never done much [due diligence on Kingate], as it will be impossible to go inside Madoff to do a proper D[ue] D[iligence]." (¶ 132.)  After news of the Madoff scandal broke, Lazear wrote to Grosso "[Kingate] is not a fund that went through our normal diligence process and I think it should not be depicted as if it had." (¶ 133.)  One day after Madoff's arrest, Lazear stated in an email that he believed BLMIS was a "scam," and had informed Grosso of "all the details" supporting his belief before Madoff had confessed.  (¶ 134.)

### 4. The Defendants Knew that a Proper Audit of the Kingate Funds by PricewaterhouseCoopers Would Expose Major Badges of Fraud at BLMIS

PricewaterhouseCoopers ("PwC") was the auditor for the Kingate Funds, but relied solely on BLMIS's auditor and did not independently verify any information.  (¶ 135.)  Grosso emailed Wetherhill in February 2008 that "the auditors [at PwC] have not looked at all into the matter of cash and cash movements [sic] controls.  Several questions have not been addressed," and in a separate February 2008 email to Wetherhill, Grosso expressed his concern that PwC might actually "start to ask all sort [sic] of questions next time they visit Madoff." (¶ 136.)

### 5. Ceretti, Grosso and FIM Attributed BLMIS's Remarkably Consistent Returns to Illegal "Front Running"

After an investment industry analyst published a newsletter in 2001 calling into question Madoff's SSC Strategy, (¶ 137), Ceretti, Grosso and FIM prepared scripted answers in a document marked "INTERNAL NOTE – NOT FOR DISTRIBUTION" to the following potential shareholder questions regarding BLMIS:

> (i)    How can there be such a relative complete lack of volatility in reported monthly returns?
>
> (ii)   How can Madoff have the ability to time the market and to turn to cash before market conditions become negative?

11

(iii)    How can Madoff have the ability to buy and sell stocks without noticeably affecting the market?

(iv)    Why has no-one [sic] been able to duplicate similar results?

(v)    How come other Wall Street firms have not become aware of the strategy and traded against it?

(vi)    Why is Madoff willing to earn commissions on trades, but not set up a separate asset management division to offer hedge funds directly to investors?

(vii)    Why doesn't Madoff borrow money and manage funds on a proprietary basis?

(¶ 138.)

In response to "How can Madoff have the ability to time the market and turn to cash before market conditions become negative?" Grosso prepared the following reply: "Madoff benefits from unique market intelligence derived from the massive amount of order flow it handles daily." (¶ 139.)  In response to "Why has no-one [sic] been able to duplicate similar results?" the Grosso's scripted reply stated "[B]eing such a large market maker (Madoff currently accounts for about 15% of all equity transactions in the United States), he sees the flows." (¶ 140.)[5]

6.    **Citi Hedge's Calculation of the Kingate Funds' Net Asset Value Could Not Be Substantiated**

Citi Hedge as administrator of the Kingate Funds calculated net asset value ("NAV") of each Fund's portfolio attributable to the US dollar shares as of the close of business on the last business day of the month, and verified the prices attributed to the securities held by the Kingate

---

[5]    The FAC describes BLMIS' activities as "illegal front running."  (¶¶ 139-40.)  "Front running is the practice by a broker of trading for his firm's proprietary account, or for his own personal account, in advance of a block trade (usually 10,000 shares or more) in circumstances in which the block trade, by its very size, will have the effect of altering the price of the security."   3 BROMBERG & LOWENFELS ON SECURITIES FRAUD § 6:104 (2d ed. 2015); *accord Trustee's Memorandum of Law in Opposition to Joint Liquidators' Motion to Dismiss Fourth Amended Complaint*, dated Oct. 14, 2014 ("*Trustee's Opposition*"), at 21 n.72 (ECF Doc. # 126) ("Front-running occurs when a stockbroker trades ahead of its customers, seeking to profit from the price differential the execution of its customers' orders would ostensibly generate.").)  The scripted responses do not imply that Madoff or BLMIS was "trading ahead" of BLMIS customer trades for their personal benefit and do not describe front running.

Funds by referring to pricing sources independent of BLMIS. (¶ 142.) Citi Hedge also prepared

and distributed monthly shareholder reports, processed new shareholder subscriptions,

maintained the Kingate Funds' corporate records, disbursed dividends, and paid legal and

accounting fees and salaries. (¶ 143.) In 2000, Grosso asked Tom Healy of Hemisphere to

amend the Kingate Funds' offering memorandum to state:

> Net asset valuations . . . are determined by the Administrator based on
> independent verification regarding the value of the Fund's portfolio assets . . . as
> of the close of business on the last Business Day of each calendar month.

(¶ 144.) Healy confirmed:

> So far this year we have been checking all the trade tickets received from Madoff
> to the monthly statement and doing a 100% verification of the pricing. Therefore,
> the proposed statement in the prospectus properly reflects what is actually
> happening.

( *Id.*)

Between 1997 and 2007, Citi Hedge received at least $5,902,037 in fees based on the

Kingate Funds' NAV. (¶ 145.)

## E.    The Defendants Knew of Impossible Trading Activity at BLMIS

### 1.    The Kingate Funds' Returns Were Impossibly Consistent Over Many Years

Kingate Funds' returns were impossibly consistent notwithstanding the volatility of the

market. (¶ 147.) FIM compared the returns of the Kingate Funds with the S&P 500 Index

which is highly correlated to the S&P 100 Index, and also tracked the Kingate Funds' results

against other Madoff feeder funds. (¶ 148.) The Kingate Funds reported positive returns at

times when the financial markets plunged, including during the burst of the dot com bubble, the

2000-2002 bear market, the aftermath of the September 11, 2001 attacks, the recession and the

2008 housing crisis. (¶ 149.) During the 116 months between April 1999 and November 2008,

Kingate Funds averaged annual returns of 12.4% while the S&P 100 Index experienced fifty-

five months of negative returns. (¶ 150.) The Kingate Funds were supposed to mimic the S&P

100 Index, but suffered negative returns in only five months of that same period. (*Id*.) During

the final fourteen months of BLMIS' existence, Kingate Funds generated positive returns while

the S&P 100 Index fell 39.4%. (¶¶ 151-52.) The May 2008 fact sheet that Kingate Funds sent

to its shareholders showed steady returns that outpaced the S&P 500 Index. (¶ 153 & fig.5.)

### 2. The Kingate Funds' BLMIS Account Statements Reflected Impossible Options Volume Trading and Equity Trades

The daily options trading volume between 1998 and 2008 depicted in the Kingate Funds'

BLMIS account statements and trade confirmations, which the Non-Fund Defendants reviewed,

regularly exceeded the total number of S&P 100 Index options contracts ("OEX options") traded

on the Chicago Board Options Exchange ("CBOE") on any particular day. (¶¶ 155-60 & figs.6-

9.) The Trustee counted 1,162 options trades on behalf of Kingate Funds that exceeded the

CBOE volume from 1998 to 2008. (¶ 161.) In addition, options traded over the counter

("OTC") are not assigned Committee on Uniform Security Identification Procedures ("CUSIP")

identification numbers, but the BLMIS OTC trade confirmations included CUSIP numbers.

(¶ 162.)

BMLIS reported that it managed $13.2 billion by the end of 2006, and Kingate Funds'

account statements with BLMIS accounted for just under a quarter of that amount (and BLMIS

proportionately allocated shares or options from its block trades among its accounts). Yet the

Defendants knew that the volume of trades BLMIS executed was more than four times what

BLMIS claimed it traded on behalf of Kingate. (¶¶ 164-65.) "Any trade comprising 50% of the

market of any one S&P 100 Index equity in one day is highly improbable, if not impossible," but

14

the Defendants "reviewed and verified" five such transactions between 2006 and 2008.  (¶ 168.)

BLMIS purportedly sold 70% of the 2.5 million shares of Wells Fargo & Company ("WFC") on

September 22, 2006 but did not move the price of the stock significantly.  (¶ 169.)

### 3.    BLMIS Purported to Sell Equities and Options Outside of the Daily Reported Price Ranges

According to Grosso, FIM would conduct an extensive analysis of the Kingate portfolio

on a monthly basis, and compare the prices of the trades with the range of prices of the day on

which the trades took place.  (¶ 170.)  The Non-Fund Defendants also reviewed the BLMIS trade

confirmations, which showed the prices for every purchase and sale of stocks and options, on a

monthly basis.  ( *Id.*)  From 1998 to 2008, 281 purported BLMIS trades fell outside the daily

reported price range for their respective security.  (¶ 173; *see ¶¶* 174-75.)[6]  BLMIS also reported

hundreds of Treasury Bills trades that fell outside the daily price range by at least one basis point

(and at least ten basis points on 144 occasions).  (¶ 176.)  The spreadsheets created by FIM in the

course of its monthly review identified whether the BLMIS reported prices fell within the daily

range, (¶ 172), and the Non-Fund Defendants reviewed and verified thousands of trades outside

of the daily price range, none of which could be legitimate.  (¶ 177.)

### 4.    Madoff's Statistically Impossible Execution When Allegedly Buying and Selling Stocks

The Kingate Funds statements reflected trades that were consistently purchased near

daily lows and sold near daily highs despite Madoff's claim he was buying and selling

throughout the day (time slicing) and reporting an average price.  Approximately 81% of the

---

[6]       For example, BLMIS reported a purported purchase of Intel Corporation on October 2, 2003 for $27.59 per share when the daily price range was between $28.41 and $28.95.  (¶ 174.)

equity purchases between 1998 and 2008 occurred in the bottom half of the daily price range and

74% of the equity sales were in the top half of the daily price range.  (¶¶ 178-82.)

**F.    The Badges of Fraud Reflected in the BLMIS Account Statements**

**1.    BLMIS Avoided SEC Reporting Requirements by Constantly Claiming to Be Out of the Market at Quarter-End and Year-End Even Though Such Investment Behavior Was Inconsistent With the SSC Strategy**

Various SEC reporting requirements are triggered when securities are invested in the

market at either the end of the quarter or the end of the year.  (¶ 183.)  Madoff purported to

liquidate all investments at those times, regardless of market conditions, and invest the proceeds

in Treasury Bills to evade these reporting requirements.  (¶¶ 183, 185.)  The Non-Fund

Defendants reviewed and verified the BLMIS statements, and knew that BLMIS' end of the

reporting period purchase of Treasury Bills contravened the SSC Strategy.  (¶ 185.)

**2.    Madoff's Purported Options Trades Were Inconsistent with the SSC Strategy**

As part of the SSC strategy, Madoff claimed to buy put options and sell call options to

hedge losses on the underlying basket of equities.  (¶ 186.)  Yet the Kingate Funds' account

statements between 1996 and 2008 reflected that such trades generated substantial gains which

were inconsistent with the SSC Strategy.  (¶¶ 187-88.)  In addition, the SSC Strategy required

that the put and call "collar" be adjusted to reflect changes in the basket of equities if some of the

underlying equities were sold before liquidation of the entire basket.  (¶ 189.)  The BLMIS

account statements showed that BLMIS often sold out of an equity position prior to liquidating

the entire basket without adjusting the collar.  (¶ 189.)

16

**3.      The Kingate Funds' Trade Confirmations Frequently Contained Settlement Anomalies in Purported Options Transactions**

Options trades, per industry practice, have a settlement date on the day following the trade. (¶ 191.)  Madoff claimed to adhere to this practice.  ( *Id*.)  At least 555 of the 2,149 total options contracts reportedly executed for the Kingate Funds between 1998 and 2008 settled outside the normal period of T+1 (the business day following the trade), and failed to comply with standard trading practices.  (¶ 192.)

**4.      The Dividend Activity Shown on Customer Statements Was Inconsistent With the Dividend Activity Sophisticated Investors Would Expect**

Kingate Funds' account statements reported money market dividends on dates that differed from the date dividends were actually paid.  (¶¶ 194-96.)  In addition, money market funds declared dividends daily and paid them monthly regardless of whether the particular fund was bought and sold multiple times during the month.  (¶ 197.)  The BLMIS statements showed numerous instances in which the same money market fund paid multiple dividends in the same month.  ( *Id*.)

**5.      The Kingate Funds' Account Statements Reflected Illegal Margin Trades**

Although Kingate Funds did not have a margin account with BLMIS, its accounts reflected negative balances on 220 occasions between 1998 and 2008, indicating illegal margin trades.  (¶¶ 199-203.)  In January 2006, Kingate Global withdrew $35 million from its BLMIS account, leaving an average negative balance of $25,403,644 for eleven days.  (¶ 204.)  Despite the apparent margin trades and negative balances, BLMIS never charged the Kingate Funds margin interest.  (¶ 205.)  The grant of interest free loans of tens if not hundreds of millions of dollars evidenced fraudulent activity, or at least a high probability of fraud.  ( *Id*.)

17

**F.**     **The Badges of Fraud Indicated from Other Sources**

**1.**     **Lack of Scalability**

Scalability is the ability of an investment strategy to handle higher trading volumes or growing assets under management.  (¶ 206.)  As assets under management increase and a fund grows, it becomes more difficult for the fund to find opportunities of a scale proportional to the fund's size.  (*Id*.)  In 1999, Grosso informed a potential investor that BLMIS managed between $6 and $8 billion.  (¶ 207.)  The defendants knew that the SSC Strategy capitalized on the limited inefficiencies in the S&P 100 Index, (¶ 208), and was not scalable for the amount of assets BLMIS supposedly had under management.  (¶ 209.)  To execute the strategy with $8 billion under management,  the SSC Strategy would have required more options than existed in the entire market.  (*Id*.)

**2.**     **Purported Options Contracts Entered into by the Kingate Funds Did Not Identify Counterparties**

BLMIS's purported over-the-counter options trades would have required counterparties to the contract, but BLMIS did not identify any.  (¶¶ 211-12.)  Madoff said counterparties put up Treasury Bills as collateral, but the Defendants did not see or confirm the existence of any such agreements.  (¶ 213.)  Nevertheless, Grosso told shareholders that "the usual suspects" were BLMIS's counterparties.  (¶ 214.)  BLMIS also represented that the counterparties took an investor's equity position as collateral.  (¶ 215.)  This contradicted Madoff's representation that a counterparty could not seize a BLMIS investor's equity position and the fact that there was no restriction on a BLMIS investor's right to withdraw funds from his account.  (*Id*.)  Moreover, because BLMIS purportedly conducted options trades in large blocks and proportionally divided the contracts among its customers, a counterparty would not know which party it was relying upon for performance.  (¶ 216.)

18

### 3.        BLMIS Lacked Independent Oversight and Customary Internal Controls

In 2007, Grosso characterized FIM Advisers as "risk conscious to the point of being obsessive," and in particular, warned against the dangers of operational, as opposed to strategy, risk.  (¶ 217.)  Yet the Defendants knew that BLMIS performed multiple roles acting as investment advisor, custodian and broker-dealer, and executed the purported trades.   (¶ 218.)  When a Hemisphere employee told Ceretti in May 2000 that a potential investor was concerned with Madoff's roles as broker and manager, Ceretti said, "keep them away from now on and let me know if they contact you again." (¶ 219.)  A 2004 FIM report described Kingate Global as "[b]elow expectations" for fund legal set-up and corporate governance, and a 2007 FIM report stated, "[t]here is a lack of independent oversight of the fund as there is no prime broker and the co-managers have delegated substantially all of the trading authority to the advisor." (¶ 220.)  FIM noted further that the Kingate Funds' administrator relies "on information provided by the advisor and as such this compromises the independent nature of the service.  The same applies to FIM's analysis of the performance." ( *Id.*)  In addition, according to its regulatory filings with the SEC, BLMIS lacked the staff necessary to perform its purported investment adviser functions, including monitoring and researching the markets, executing the equities and options trades in accordance with the SSC Strategy, and taking and verifying custody of securities. (¶ 221.)

### 4.        Warnings of Fraudulent Activity at BLMIS Raised by Third Parties

In January 2005, Ceretti knew that Credit Suisse had advised its clients to sell funds invested with BLMIS because its investment strategy was too risky, (¶¶ 103, 223), and in 2007, Merrill Lynch told FIM that it would not invest with the Kingate Funds because of concerns with Madoff.  (¶ 224.)

19

In June 2008, HSBC issued a warning about Kingate Funds due to the lack of information coming from Madoff regarding his strategy and investment advisory business. (¶ 225.) Grosso dismissed the HSBC analyst as a "junior guy" and a "joker," admitted that Madoff concerns were "not new" and that "[t]his has been going on for 20 years." (*Id.*) Ceretti reminded an HSBC Monaco representative that HSBC was an administrator of Kingate and several other funds and that several clients banked with HSBC Monaco, prompting the representative to assure Ceretti that people would be fired for issuing such a warning about Kingate Funds. (*Id.*) In November 2008, Grosso dismissed his concerns about BLMIS' lack of transparency and Madoff's possible conflict of interest regarding Madoff's multiple roles, stating that the analyst lacked an understanding of options strategies, the Kingate structure and the U.S. broker-dealer industry. (¶ 226.)

### 5.    BLMIS, Known as a High-Technology Firm, Provided Only Time-Delayed Paper Statements

Real-time electronic access to accounts was industry practice by 2000. (¶ 228.) Even though Madoff represented himself to be a pioneer in electronic trading, and the Defendants knew of his technical savviness, BLMIS did not provide its customers with electronic access to their accounts, and only provided paper account statements and confirmations sent by mail. (¶¶ 229, 231.) Hemisphere told Grosso that it received information from Madoff six working days after the date of the trade. (¶ 230.) Nevertheless, BLMIS's statements, which were reviewed and verified by the Defendants, lacked standard information, including opening account balances, trade dates, commissions, and ticker symbols. (¶ 232.)

6.      Madoff's "Strip Mall" Auditor Was Not Qualified or Capable of Auditing a
Global Investment Management Company with Billions of Dollars Under Management

BLMIS employed Friehling & Horowitz, a small accounting firm located in a strip mall

in Rockland, New York.  (¶ 235.)  Accounting auditors must undergo peer review by the

American Institute of Certified Public Accountants.  (¶ 237.)  Friehling & Horowitz avoided peer

review by representing that it had not performed audit work since 1993.  (¶ 238.)  Ceretti,

Grosso, and the Management Defendants knew that Friehling & Horowitz were BLMIS'

auditors, (¶ 235), but did not independently confirm whether Friehling & Horowitz was equipped

to audit the multi-billion dollar investment advisory business at BLMIS, and never inquired as to

the firm's ability to act as an auditor.  (¶¶ 236, 238.)

7.      Contrary to Standard Industry Practice, Madoff Charged No Management
Fees

Contrary to industry practice, BLMIS did not charge management fees but instead

charged commissions on transactions.  (¶ 239.)  BLMIS effectively turned down a substantial

amount of money that it would have earned in management fees.  Typically, a fund manager will

charge between a 1% and 2% management fee and between a 10% and 20% performance fee.

(¶¶ 240-41.)  BLMIS, however, charged a $0.04 commission per share on stock transactions and

a $1 commission per option contract.  (¶ 241.)  Under a 1%/10% system, Madoff would have

earned more than $250 million in fees from Kingate Funds from 1995 to 2008.  ( *Id.*)

G.      This Adversary Proceeding

The Trustee commenced this adversary proceeding on April 17, 2009 and filed the FAC

on March 17, 2014.  The Amended Complaint asserts twelve claims for relief summarized in the

following table:

21

| Count | ¶¶ | Defendant(s) | Description of Claim(s) |
|---|---|---|---|
| 1 | 262-71 | Kingate Funds | Avoid and recover the 90-day preferential transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 502(d) 547(b), 550(a), 551, and 15 U.S.C § 78fff-2(c)(3) incurred by the debtor to Kingate Funds. |
| 2 | 272-77 | Kingate Funds | Avoid and recover the actual two-year fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 502(b) 548(a)(1)(A), 550(a), 551, and 15 U.S.C § 78fff-2(c)(3) incurred by the debtor to Kingate Funds. |
| 3 | 278-86 | Kingate Funds | Avoid and recover the constructive two-year fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 502(d) 548(a)(1)(B), 550(a), 551, and 15 U.S.C § 78fff-2(c)(3) incurred by the debtor to Kingate Funds. |
| 4 | 287-92 | Kingate Funds | Avoid and recover the actual six-year fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 276, 276-a, 278, 279 incurred by the debtor to Kingate Funds. |
| 5 | 293-98 | Kingate Funds | Avoid and recover the constructive six-year fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 273, 278, 279 incurred by the debtor to Kingate Funds. |
| 6 | 299-304 | Kingate Funds | Avoid and recover the constructive six-year fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 274, 278, 279 incurred by the debtor to Kingate Funds. |
| 7 | 305-10 | Kingate Funds | Avoid and recover the constructive six-year fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 275, 278, 279 incurred by the debtor to Kingate Funds. |
| 8 | 311-17 | Kingate Funds | Avoid and recover the undiscovered fraudulent transfers (initial transfers), and disallow claims (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law |

| | | | §§ 276, 276-a, 278, 279, N.Y. C.P.L.R. 203(g), 213(8) incurred by the debtor to Kingate Funds. |
|---|---|---|---|
| 9 | 318-21 | Subsequent transferee defendants | Recovering the subsequent transfers under 11 U.S.C. §§ 550(a), 551 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 276-a, 278 from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS. |
| 10 | 322-27 | Kingate Funds | Objection to and disallowance of any and all restitution and other claims of Kingate Funds against BLMIS based on their knowledge of the fraud, under 11 U.S.C. § 502(a), 502(b)(1), 15 U.S.C. § 78fff(b), 78fff-1(a). |
| 11 | 328-33 | Kingate Funds | Equitable subordination of any and all claims of Kingate Funds against BLMIS due to Defendants' inequitable conduct, under 11 U.S.C. §§ 105(a), 510(c). |
| 12 | 334-39 | Kingate Funds | Equitable disallowance of any and all claims of Kingate Funds against BLMIS due to Defendants' failure to deal fairly and in good faith. |

The Joint Liquidators of the Kingate Funds have moved to dismiss the FAC.  (*See Kingate Global Fund Ltd. and Kingate Euro Fund Ltd.'s Memorandum of Law in Support of Their Motion to Dismiss the Fourth Amended Complaint*, dated July 18, 2014 ("*Liquidators Memo*") (ECF Doc. # 112).)  In the main, they contend that the FAC fails to allege that the Kingate Funds' managers and advisors (*i.e.*, the Non-Fund Defendants) had actual knowledge of Madoff's fraudulent scheme, and consequently, the transfers of principal (other than those avoidable under Bankruptcy Code § 548(a)(1)(A)) are protected under the safe harbor in Bankruptcy Code § 546(e).  In addition, the Bankruptcy Code § 548(a)(1)(A) intentional fraudulent transfer claims should be dismissed because the FAC also fails to allege that the Non-Fund Defendants willfully blinded themselves to Madoff's scheme.  Consequently, they gave "value" in good faith for the withdrawal of their principal investments.  But even if the FAC

pleaded actual knowledge or willful blindness by the Non-Fund Defendants, their knowledge is

not imputable to the Kingate Funds.  Finally, the Movants argue that the FAC fails to plead

claims sounding in equitable subordination or equitable disallowance of the Funds' customer

claims.

## DISCUSSION

### A.    Standards Governing the Motion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 570.  Courts do not decide

plausibility in a vacuum.  Determining whether a claim is plausible is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*,

556 U.S. at 679.  "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678;

*Twombly*, 550 U.S. at 570.  "Where a complaint pleads facts that are 'merely consistent with' a

defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement

to relief."'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

*Iqbal* outlined a two-step approach in deciding a motion to dismiss.  First, the court

should begin by "identifying pleadings that, because they are no more than [legal] conclusions,

are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.  "Threadbare recitals of the

elements of a cause of action supported by conclusory statements" are not factual. *See id.* at 678.

Second, the court should give all "well-pleaded factual allegations" an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief. *Id.* at 679.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court may also consider documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *McKevitt v. Mueller*, 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010). Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss. *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1532 n.23 (S.D.N.Y. 2010).

## B.    Counts I through VIII (Avoidance Claims)

### 1.    Introduction

Count I seeks to avoid and recover the transfers made to the Kingate Funds within 90 days of the Filing Date, and Counts II through VIII seek to avoid and recover actual and constructive fraudulent transfers made to the Kingate Funds under New York and federal bankruptcy law up to six years before the Filing Date. These Counts also ask the Court to

disallow the claims filed on behalf of the Kingate Funds pursuant to 11 U.S.C. § 502(d) until the avoided transfers are returned.[7]

The Trustee's ability to avoid and recover transfers has been limited by several decisions issued by the Second Circuit Court of Appeals and the District Court.  In light of the safe harbor granted under 11 U.S.C. § 546(e), the Trustee may only avoid and recover intentional fraudulent transfers under § 548(a)(1)(A) made within two years of the filing date, *Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 423 (2d Cir. 2014), *cert. denied*, 135 S.Ct. 2859 (June 22, 2015); *Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011) ("*Katz*"), unless the transferee had actual knowledge of Madoff's Ponzi scheme, or more generally, "actual knowledge that there were no actual securities transactions being conducted."  SIPC *v. BLMIS*, No. 12 Misc. 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").  The safe harbor was intended, among other things, to promote the reasonable expectations of legitimate investors.  If an investor knew that BLMIS was a Ponzi scheme, he had no reasonable expectation that he was signing a securities contract with BLMIS for the purpose of trading securities for his account.  *Id.*  In that event, the Trustee may avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted under state and federal bankruptcy law.  *See id.* at *6.

The transferee's knowledge is also relevant under 11 U.S.C. § 548(c).  Section 548(c) provides a defense to a fraudulent transfer claim brought under Bankruptcy Code § 548(a) to the extent the transferee "takes for value and in good faith."  11 U.S.C. § 548(c).  Where, as here, the Trustee seeks to recover the transfer of principal rather than fictitious profits he must plead the

---

[7]        The FAC does not allege that the Kingate Funds or their Liquidators submitted claims, but as noted, they lost nearly $900 million investing with BLMIS.

transferee's lack of subjective good faith.  *SIPC v. BLMIS*, 12 Misc. 115 (JSR), 2014 WL

1651952, at *5 (S.D.N.Y. Apr. 27, 2014) ("*Good Faith Decision*").  Lack of objective good faith

is not enough "because the securities laws do not ordinarily impose any duty on investors to

investigate their brokers, [and] those laws foreclose any interpretation of 'good faith' that creates

liability for a negligent failure to so inquire."  *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y.

2012); *accord Katz*, 462 B.R. at 455.

In summary, in order to meet his pleading burden under Counts I and III through VIII, the

Trustee must plead that BLMIS made an avoidable transfer and the transferee had actual

knowledge that BLMIS was not engaged in the trading of securities.  If the FAC does not plead

actual knowledge, the Trustee can still recover intentional fraudulent transfers pursuant to

Bankruptcy Code § 548(a)(1)(A) under Count II if he pleads and proves that the Kingate Funds

willfully blinded themselves to the fact that BLMIS was not engaged in the actual trading of

securities.  *See Good Faith Decision*, 2014 WL 1651952, at *4; *Katz*, 462 B.R. at 454, 455-56.

## 2.    Knowledge

"'[A]ctual knowledge' implies a high level of certainty and absence of any substantial

doubt regarding the existence of a fact."  *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 139

(Bankr. S.D.N.Y. 2014) ("*Merkin*"); *accord* BLACK'S LAW DICTIONARY 1003 (10th ed. 2014)

(Knowledge is a "state of mind in which a person has no substantial doubt about the existence of

a fact.").  In contrast, "willful blindness connotes strong suspicion but *some* level of doubt or

uncertainty of the existence of a fact and the deliberate failure to acquire actual knowledge of its

existence."  *Merkin*, 515 B.R. at 140 (emphasis in original); *accord Global–Tech Appliances,*

*Inc. v. SEB S. A.*, 131 S.Ct. 2060, 2070 (2011) (The two basic requirements of willful blindness

are "(1) the defendant must subjectively believe that there is a high probability that a fact exists

and (2) the defendant must take deliberate actions to avoid learning of that fact.")  Willful

blindness is equivalent to the criminal law concept of "conscious avoidance."  *See United States

v. Samaria*, 239 F.3d 228, 239 (2d Cir. 2001) ("The conscious avoidance doctrine provides that a

defendant's knowledge of a fact required to prove the defendant's guilt may be found when the

jury 'is persuaded that the defendant consciously avoided learning that fact while aware of a high

probability of its existence.'") (citation omitted), *overruled in part on other grounds*, *United

States v. Huezo*, 546 F.3d 174 (2d Cir. 2008).

Many courts in this district and circuit have held that allegations of willful blindness or

conscious avoidance satisfy the requirement to plead the element of actual knowledge to support

a claim for aiding and abetting the primary wrong.[8]  *E.g.*, *Iowa Public Emp.'s Ret. Sys. v.

Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 345 (S.D.N.Y. 2013), *aff'd*, 558 F. Appx. 138 (2d

Cir. 2014); *Clarke v. Cosmo* (*In re Agape Litig.*), 773 F. Supp. 2d 298, 308-09 (E.D.N.Y. 2011)

(discussing cases); *Fraternity Fund, Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349,

368 (S.D.N.Y. 2007) ("[T]he Second Circuit has held in the criminal context that conscious

avoidance may satisfy the knowledge prong of an aiding and abetting charge.  Accordingly, the

Court sees no reason to spare a putative aider and abettor who consciously avoids confirming

facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she

substantially furthers."); *but see Rosner v. Bank of China*, No. 06 CV 13562 (VM), 2008 WL

5416380, at *8 (S.D.N.Y. Dec. 18, 2008) (stating that a "minority" of cases in the district have

accepted allegations of willful blindness to satisfy the requirement of pleading actual

knowledge), *aff'd*, 349 F. App'x. 637 (2d Cir. 2009).  In the context of the Madoff litigations,

---

[8]     The elements of an aiding and abetting claim are (1) a violation by the primary wrongdoer, (2) the
defendant's actual knowledge of the primary violation and (3) the defendant's substantial assistance to the
commission of the primary violation.  *See Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d. Cir. 2009).

Judge Rakoff has rejected willful blindness as a substitute for actual knowledge for purposes of the safe harbor. *Cohmad*, 2013 WL 1609154, at *4 n. 2.[9]

### 3.    The FAC Pleads Actual Knowledge

The FAC plausibly alleges that the Non-Fund Defendants, particularly Ceretti and Grosso, knew that Madoff was not engaging in the securities transactions he reported, and that many of the entries in the statements and trade confirmations depicted trades that could not have taken place. They received internal warnings from FIM that BLMIS had not been subjected to its rigorous due diligence standards, and FIM's Head of Operational Due Diligence, Eric Lazear, acknowledged that FIM could not perform due diligence because it was impossible to go inside Madoff, (¶ 132), a sign of fraud. (*See* ¶¶ 120, 127.) Lazear also told Grosso that if Grosso did not own FIM and the Funds, Lazear would have vetoed any investment with BLMIS. (¶ 134.)

Although the due diligence was wanting, the Non-Fund Defendants closely monitored the performance of the Kingate Funds on a regular basis, and their review disclosed impossible trades. For example, Kingate Management prepared and the other Non-Fund Defendants reviewed monthly spreadsheets that identified whether the trades reported by BLMIS fell within the daily price range of the each traded security. (¶¶ 170-72.) Between 1998 and 2008, BLMIS reported equity sand options trades outside the daily price range 281 times, (¶ 173), and U.S. Treasury Bills trades outside the daily price range on 836 occasions. (¶ 176.) They also reflected Madoff's statistically uncanny ability to buy equity securities at prices in the lower range of the daily prices and sell them at prices in the higher range of the daily prices. (¶¶ 180-

---

[9]    Citing *O'Connell v. Penson Fin. Servs., Inc.* (*In re Arbco Capital Mgmt., LLP*), 498 B.R. 32 (Bankr. S.D.N.Y. 2013), the Trustee argues that allegations of willful blindness are sufficient to survive a motion to dismiss based on the Bankruptcy Code § 546(e) safe harbor and may be sufficient, if proven, to constitute actual knowledge. (*Trustee's Opposition* at 16-17.) As noted, however, Judge Rakoff has ruled that pleading willful blindness is not sufficient to exempt the Trustee from the safe harbor, and the Court is bound by that determination.

81.)  Citi Hedge's predecessor also received the BLMIS monthly statements and performed a

100% verification of the pricing.  (¶ 144.)  In addition, the monthly spreadsheets prepared by

Kingate Management detailed dividend activity, (¶ 171), and disclosed 432 occasions on which

companies supposedly paid dividends on dates that were contrary to industry practice.  (¶¶ 194-

97.)  Finally, the monthly statements disclosed trades on margin even though the Kingate Funds

did not maintain margin accounts, (¶¶ 199-204), settlement dates that were inconsistent with

industry practice,  (¶¶ 191-92), option trades that did not identify counterparties, (¶ 212), and

over-the-counter option trades that included CUSIP numbers.  (¶ 162.)

　　　The FAC also alleges that Ceretti and Grosso took steps to deflect inquiries directed at

Madoff implying that they feared what might be discovered.  When an investor asked to meet

Madoff he was told by Ceretti that an introduction was a "sticky issue."  (¶ 120.)  When a

Hemisphere employee told Ceretti in May 2000 that a potential investor expressed a concern

with Madoff's role as both broker and manager, Ceretti responded "keep them away from now

on and let me know if they contact you again."  (¶ 219.)  When outside analysts raised questions

or issued warnings about Madoff's lack of transparency or his conflicting roles as investment

advisor, broker and custodian, Ceretti and/or Grosso responded with *ad hominem* attacks, (*see* ¶¶

225, 226), and in one instance, a veiled threat to HSBC that it could lose the business of the

Funds, other funds and clients that banked with HSBC.  As a result, HSBC backed off and

assured Ceretti that it would fire anyone responsible for issuing the warning.  (¶ 225.)

　　　The allegations in the FAC imply that Ceretti understood the level of concern relating to

Madoff and fabricated stories to placate the Funds' shareholders.  In May 2001, a newsletter

expressed skepticism about the legitimacy of Madoff's strategy.  Grosso anticipated questions

from shareholders, including the relative lack of volatility in monthly returns reported by

BLMIS, Madoff's ability to time the market and turn to cash before market conditions became negative, his ability to buy and sell stocks without noticeably affecting the market, the inability to duplicate his results or trade against his strategy, Madoff's unusual fee structure and why he didn't borrow money and manage funds on a proprietary basis. (¶ 138.) The scripted responses he prepared attributed Madoff's remarkable success to his unique market intelligence derived from the massive amount of order flow he handled (15% of all equity transactions in the United States) that allowed him to see the flows. (¶¶ 139-40.) The responses were plainly made up, intended to soothe shareholder anxieties, and did not result from any investigation or inquiry. On another occasion, Grosso told shareholders that BLMIS entered into options contracts with the twenty or thirty counterparties that comprised the "usual suspects." (¶ 214.) Since the trade confirmations did not identify the counterparties, Grosso did not know who they were, and more importantly, did not know who Kingate Funds could look to if the counterparty failed to perform. (¶ 211.)

Finally, Grosso's anxiety about a possible inquiry into BLMIS by PwC implies his unease with what PwC might discover about Madoff. PwC was the Funds' auditor. In the past, it had relied on reports from Madoff's auditor and did not independently verify the information. (¶ 135.) In a February 2008 email to Wetherill, Grosso expressed his fear that PwC might actually "start to ask all sort [sic] of questions next time they visit Madoff." (¶ 136.) His disquiet adds significance to an email sent by Lazear to Grosso the day after Madoff's arrest in which he reminded Grosso that he had *previously* emailed Grosso "all the details" to support his belief that BLMIS was a "scam." (¶ 134.)

The totality of the allegations in the FAC paint a picture of sophisticated financial professionals who knew that Madoff was reporting fictitious transactions, and took steps to

prevent any inquiry.  The allegations regarding the actual knowledge of the Non-Fund

Defendants stand in sharp contrast to those in *Merkin* where the Court concluded the complaint

failed to plead actual knowledge.  The *Merkin* complaint referred to Merkin's speculations that

BLMIS might be a Ponzi scheme, and the warnings by Teicher, a money manager, that BLMIS'

returns were not possible.  *Merkin*, 515 B.R. at 140.  In addition, the complaint alleged that

Merkin was aware of several of the red flags, including the lack of correlation between the

performance of BLMIS and the S&P 500 and the excessive volume of option trading.  *Id.*

Still, the complaint did not imply that Merkin actually believed that BLMIS was a Ponzi

scheme, and at most, indicated that he had a strong suspicion.  If he really believed that BLMIS

was a Ponzi scheme, it was implausible that he would joke to third parties about it.  *See id.*  Nor

did the complaint allege that he conducted an analysis other than maintaining a single folder

containing documents and analyses relating to the lack of correlation between of BLMIS'

performance and the performance of the S&P 500.  Instead, the complaint painted a picture of

someone who saw the red flags and ignored them.  In contrast, the Non-Fund Defendants

actively reviewed the impossible transactions reported by Madoff in the Funds' accounts,

deflected any inquiry into Madoff and feared what PwC might uncover.

### 4.    Imputation

In order to recover from the Funds under the Avoidance Claims, the FAC must also plead

facts that permit the imputation of the Non-Fund Defendants' knowledge to the Kingate Funds.

The Movants contend that imputation is improper because the Non-Fund Defendants acted

outside the scope of their duties and adversely to the Kingate Funds.  (*Liquidators Memo* at 24-

25.)

In *Merkin*, the Court explored the rules relating to imputation of knowledge acquired by an agent.  Generally, knowledge acquired by an agent while acting within the scope of his authority is imputed to the principal.  But the agent's knowledge will not be imputed under the adverse interest exception if he totally abandons his principal's interests and acts entirely for his own or another's purposes; it is not enough that the agent has a conflict of interest or does not act primarily for the benefit of his principal.  Furthermore, the law distinguishes between frauds that benefit the principal and frauds that hurt the principal, and frauds whose harm flows from the discovery of the fraud rather than the fraud itself.  If the fraud does not hurt the principal, or the harm flows from the discovery of the fraud rather than the fraud itself, the adverse interest exception does not apply.  *See Merkin*, 515 B.R. at 146-47.

The Non-Fund Defendants were agents of the Kingate Funds, and their dealings with BLMIS and Madoff on the Funds' behalf fell within the scope of their duties.  Ceretti and Grosso created the Funds to invest exclusively with BLMIS and created the Management Defendants to manage the Kingate Funds.  In addition, Citi Hedge provided administrative services for the Kingate Funds.

The Movants nevertheless contend that the Non-Fund Defendants acted adversely to the Kingate Funds' interests, and the adverse interest exception precludes imputation of their knowledge.  The primary basis for their argument is that the Non-Fund Defendants knowingly invested in Madoff's Ponzi scheme or willfully blinded themselves to the possibility of Madoff's Ponzi scheme solely to increase the management fees they took from the Kingate Funds. (*Liquidators Memo* at 24.)  The FAC alleges, in this regard, that the Kingate Funds did not charge performance fees and passed the 1.5% management fees they charged the shareholders

through to Kingate Management and Tremont.[10]  (¶ 107.)  Moreover, the Kingate Funds invested 100% of the money they received from their shareholders in BLMIS.  Hence, they did not derive any benefit from their shareholders' investments, including from any fictitious profits ploughed back into BLMIS, and they paid substantial management fees to boot.

The allegations in the FAC are nonetheless sufficient to support the inference that the Funds benefitted from the actions of their agents even if the agents were conflicted and also acted for their own benefit.  The Funds were formed to raise money from shareholders to invest in BLMIS.  The BLMIS investments were the focus of the Non-Fund Defendants' activities alleged in the FAC.  The increasing management fees paid by the Kingate Funds over the years, (*see* ¶¶ 108-09), indicate that the value of the investments in the Kingate Funds continued to grow.  As discussed in *Merkin*, a corporation benefits from an aura of profitability that enables it to attract more investors.  *Merkin*, 515 B.R. at 148.  It is true that unlike the funds at issue in *Merkin*, the Kingate Funds were fully invested in BLMIS and did not use increased investments or fictitious profits to make other potentially profitable investments.  *See id.* at 148-49. *Merkin* did not suggest, however, that this was the *sine qua non* for imputing knowledge, and relied principally on the growth of the fund to support its conclusion that imputation was appropriate. *Id.* at 148.  Furthermore, the apparent profitability of the Funds benefitted those shareholders who withdrew money from the Funds before Madoff's fraud was discovered.[11]

---

[10]    During the period 1996-2008, the Kingate Funds paid management fees aggregating $376,052,130. (¶¶ 108-09.)

[11]    Although the value of the Funds' investment in BLMIS was fictitious and the Funds ultimately lost a substantial sum, the loss occurred after the discovery of Madoff's scheme.  Until then, the Funds appeared to grow and shareholders continued to withdraw their money.  Had Madoff's fraud continued longer, the apparent benefit to the Funds and their shareholders would have continued too.

Finally, although the Funds did not retain any management fees received from the shareholders, the arrangement did not necessarily harm the Funds even if it ultimately benefitted Kingate Management and Tremont. The Funds were essentially conduits when it came to the management fees. They charged their shareholders 1.5% of the NAV, and passed the fees along to Kingate Management and Tremont. If the Funds had not done so, they would have had to pay management fees to the Management Defendants from some other source.

Accordingly, the Court concludes that the FAC pleads sufficient facts to permit imputation of the Non-Fund Defendants' knowledge to the Funds. The motion to dismiss the Avoidance Claims is, therefore, denied. In light of this conclusion, the Court does not reach the issue of willful blindness. If the Funds had actual knowledge that Madoff was not trading securities and the securities identified in their account statements were fictitious, they did not receive the initial transfers in good faith within the meaning of 11 U.S.C. § 548(c).

## C.    Counts X and XII (the Disallowance Claims)

Since the FAC adequately pleads the Avoidance Claims, it adequately pleads that any customer claims submitted by the Funds must be disallowed under 11 U.S.C. § 502(d); *see SIPC v. BLMIS*, 513 B.R. 437, 443 (S.D.N.Y. 2014) (holding that § 502(d) applies to customer claims in a SIPA case). The Trustee also seeks to disallow the Kingate Funds' customer claims for the independent reason that the Funds acted inequitably. Counts X alleges that the Funds are not entitled to restitution because they invested with actual knowledge of Madoff's fraudulent activity, and enabled Madoff to perpetuate his Ponzi scheme, (¶¶ 323-24), and seeks to disallow the customer claims under SIPA which is incorporated through Bankruptcy Code § 502(b)(1) (disallowing a claim if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is

35

contingent or unmatured").  Count XII avers that the Funds misled customers as to the true

financial condition of BLMIS, induced the other customers to invest and hindered and delayed

the other customers' ability to recover the amounts due them, (¶¶ 335-36), and seeks to disallow

the Funds' customer claims under general principles of equity.

The Court addressed the same claims at length in *Merkin* and rejected them.  It concluded

that SIPA did not permit the equitable disallowance of a customer claim to the principal the

customer had invested; it only disqualified the customer from participating in the insurance fund

administered by SIPC.  *Merkin*, 515 B.R. at 153-56.  It also concluded that there was no basis to

disallow a claim under general principles of equity.  *Id.* at 156-57.  Counts X and XII are

dismissed for the same reasons.

**D.      Count XI (Equitable Subordination)**

Count XI seeks to subordinate the Funds' customer claims to all other customer claims

under principles of equitable subordination based on substantially the same conduct and injuries

to creditors alleged in Counts X and XII.  (*See* ¶¶ 330-31.)  The Movants argue that the Trustee

lacks standing to assert a claim for equitable subordination because the alleged inequitable

conduct harmed only a subset of creditors and the claim belongs to those creditors, the claim is

barred by the *Wagoner* Rule and the doctrine of unclean hands, and the FAC fails to allege that

the Funds' conduct was inequitable or harmed other customers.  (*Liquidators Memo* at 29-34.)

The standing objection lacks merit.  The Trustee is the steward of the customer property

estate, and is seeking to subordinate the Funds' customer claims to the customer claims of all net

losers with allowed customer claims against the customer property estate.  In addition, the Court

rejected the application of the *Wagoner* rule, a rule of standing, in *Merkin*.  There, the Court

concluded that the rule enunciated in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114

(2d Cir. 1991) did not apply because equitable subordination claims did not exist or belong to the

creditors at common law and did not become property of the estate under 11 U.S.C. § 541(a)(1)

on the Filing Date.  Hence, the pre-filing limitations on the debtor's ability to assert causes of

action, of which the *Wagoner* rule is one, did not affect the equitable subordination claim.

Furthermore, a creditor could bring his own equitable subordination claim only if he could allege

a particularized injury from the defendant's inequitable conduct.  *Merkin*, 515 B.R. at 159.  Here,

all net losers suffered the same injury—the depletion of the customer property estate by virtue of

the Funds' withdrawals from BLMIS.  Only the Trustee can bring that claim.

The Movants' "unclean hands" argument sounds like an invocation of *in pari delicto*, a

phrase that is often used interchangeably with the *Wagoner* rule to dismiss a cause of action for

lack of standing.  *See Kirschner v. KPMG LLP*, 938 N.E.2d 941, 959-60 (N.Y. 2010) (Ciparick,

J., dissenting).  To that extent, it is inapplicable for the same reasons as the *Wagoner* rule.  If the

Movants mean something different, "unclean hands" is an affirmative defense that the defendant

must prove.  *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 546

(S.D.N.Y. 2012).  Finally, the "unclean hands" is not a defense to an equitable subordination

claim because the claim focuses on the inequitable conduct of the *creditor*, not the debtor.

*LightSquared LP v. SP Special Opportunities LLC* (*In re LightSquared Inc.*), 511 B.R. 253, 345

n.151 (Bankr. S.D.N.Y. 2014); *see accord Official Comm. of Unsecured Creditors v. Halifax

Fund, L.P.* (*In re AppliedTheory Corp.*), 345 B.R. 56, 59 (S.D.N.Y.2006) ("The purpose of

equitable subordination is to undo wrongdoing by an individual creditor in the interest of the

other creditors."), *aff'd,* 493 F.3d 82 (2d Cir. 2007).

37

This leaves the sufficiency of the allegations.  Because the FAC alleges that the Funds did not receive the initial transfers in good faith, it also adequately alleges that they engaged in inequitable conduct.  *Katz*, 462 B.R. at 456.  In addition, the FAC alleges that the Funds' inequitable conduct harmed creditors.  The Movants' disingenuously contend that the harm relied on by the Trustee concerned the Funds' *investing* in BLMIS.  (*Liquidators Memo* at 32) ("The Trustee's entire claim is seemingly that the Funds harmed other customers merely by investing in BLMIS. . . . Because the Trustee has failed to allege that the Funds did something other than merely invest in BLMIS, which alone does not establish harm to customers, he cannot state a claim for equitable subordination.")  The unfair advantage and ensuing harm resulted from the withdrawals.  (¶ 329) ("The Kingate Funds engaged in inequitable conduct, . . . and benefited by the withdrawal of approximately $925,351,905, during the lifetime of the Kingate Funds' accounts at BLMIS.")  Although the Funds are net losers, the money they withdrew would have been available to innocent net losers who did not knowingly invest in a Ponzi scheme.  *See Merkin*, 515 B.R. at 160.

Accordingly, the motion to dismiss Count XI is denied.  Submit order.

Dated: New York, New York
       August 11, 2015

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge